REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1469

September Term, 2015

---

BASHAWN MONTGOMERY RAY

v.

STATE OF MARYLAND

---

Krauser, C.J.,
Nazarian,
Moylan, Charles E., Jr.
(Senior Judge, Specially Assigned),

JJ.

---

Opinion by Moylan, J.

---

Filed: September 29, 2016

The subject is Maryland Rule of Procedure 4-345(a)'s provision that: "The court may correct an illegal sentence at any time." The appellant, Bashawn Montgomery Ray, filed in the Circuit Court for Montgomery County on March 23, 2015, just such a motion to correct what he deemed to be an illegal sentence. On July 24, 2015, the court denied the motion without hearing or written opinion. This appeal followed. It presents an appropriate occasion for a macroscopic overview of Rule 4-345(a): its origin; its purpose; its resultant freedom from a filing deadline; its critical distinction between inherent sentence illegality and antecedent procedural illegality; the great leap forward from looking simply at statutory sentencing caps to more ambiguous caps imposed by plea negotiations; and the criteria for deciding precisely what a negotiated agreement means.

## Antecedent Trial and Appeals

At the trial of the case based on the agreed statement of facts on April 18, 2011, the appellant was found 1) guilty of conspiracy to commit theft of property with a value of at least $1,000 and 2) guilty of making a false statement when under arrest. On August 11, 2011, he was sentenced to a term of ten years' incarceration with all but four years suspended followed by four years of probation.

The appellant appealed his convictions to this Court. In a 44-page opinion in Ray v. State, 206 Md. App. 309, 47 A.3d 1113 (2012), this Court affirmed the convictions. That opinion is not pertinent to the issue now before us. The Court of Appeals granted certiorari to consider the single issue of whether there was probable cause for the arrest. The majority

1

opinion for the Court, however, held that the Fourth Amendment issue had not been properly preserved for appellate review. <u>Ray v. State</u>, 435 Md. 1, 76 A.3d 1143 (2013). The Court of Appeals opinion is not pertinent to the issue now before us.

**The Belated Contention**

Despite having slept quietly on this complaint for three and one-half years, the appellant now raises the contention that his sentence of ten years' incarceration with all but four years suspended was an inherently illegal sentence under Rule 4-345(a) because it exceeded the legal cap imposed upon it that had been bargained for as a condition of his plea of not guilty on an agreed statement of facts. The contention, however tardy, is cognizable.

**For Auld Lang Syne**

Whence, then, Rule 4-345(a)'s unique and open-ended filing calendar? Rule 4-345(a), without the loss or gain of a comma, has been with us a long time (since 1951). The Rules of Criminal Procedure were completely recodified by Order of the Court of Appeals dated April 6, 1984, and effective as of July 1, 1984. What is now Rule 4-345(a) had theretofore been codified, verbatim, as Maryland Rule 774(a). That provision had, in turn, been codified as Maryland Rule 764(a) prior to July 1, 1977. Before a yet earlier rewriting of the Maryland Rules of Procedure, adopted on September 15, 1961 and effective as of January 1, 1962, the provision, in precisely its present language, had been Rule 744(a). Before 1962, the same unchanged provision had been Rule 10(a) of the

Criminal Rules of Practice and Procedure. As Rule 10(a), it may be found, in the verbatim language of Rule 4-345(a) today, in Vol. 3, Horace Flack, Annotated Code of Maryland, Appendix B, General Rules of Practice and Procedure (1951). In Drain v. Warden, 207 Md. 620, 621, 113 A.2d 422 (1955), the Court referred to this venerable progenitor of today's rule: "If a sentence is illegal, the trial court may correct it at any time. General Rules of Practice and Procedure, part 4, rule 10."

The General Rules of Practice and Procedure were first adopted by the Court of Appeals in 1941. The minutes of the meeting of the Standing Committee on Rules of Practice and Procedure of March 28, 1950, reflect that the reporter "presented for the consideration of the Committee a letter from Chief Judge Ogle Marbury," reading in part:

> "At the Conference (Judiciary) the question was raised whether judges have power after the expiration of the term, or after 30 days, to reduce or suspend sentences imposed by them in criminal cases. The county judges were practically unanimous in their view that it could not be done, but the city judges seem to be doing it without any definite authority."

Chief Judge Marbury's request to the Rules Committee had been prompted by a discussion among judges at the Fifth Annual Meeting of the Judicial Council of Maryland in 1950 in which there was spirited disagreement over whether a trial judge possessed any authority to correct an illegal sentence or otherwise amend a sentence after the formal term of court in which the sentencing took place had terminated. The minutes of the meeting in Annapolis of May 29, 1951, reflect that the Rules Committee recommended to the Court

of Appeals what the Court subsequently adopted as Rule 10(a): "The Court may correct an illegal sentence at any time."

What is now Rule 4-345(a) is virtually identical to an earlier version of Federal Rule of Criminal Procedure 35. Johnson v. State, 274 Md. 29, 39, 333 A.2d 27 (1975) ("Rule 35 of the Federal Rules of Criminal Procedure ... is virtually identical to the provisions of Maryland Rule 764a."). Federal Rule 35(a) at that time provided, "The court may correct an illegal sentence at any time." In Berkoff v. Humphrey, 159 F.2d 5, 7 (1947), the Eighth Circuit pointed out that Federal Rule 35 "became effective March 21, 1946, but made no change in existing law." Thus, with respect to what is now Rule 4-345(a), the limit of legal memory is the 1951 adoption by the Court of Appeals of what then became Rule 10(a) of the Maryland Rules of Practice and Procedure. Beyond 1951, appellate memory runneth not to the contrary.

### Reason For the Filing Exemption

Rule 4-345(a)'s exemption from a filing deadline is, indeed, a very narrow one. Despite the generality of the Rule's wording, it does not permit the correction "at any time" of any illegality that may have lead to or contributed to the sentence being challenged. The illegality referred to by Rule 4-345(a) must be an illegality inherent in the sentence itself as opposed to being some procedural (even constitutional) flaw in the trial resulting in the conviction for which the sentence is imposed or even a flaw in the sentencing procedure

4

itself. Tshiwala v. State, 424 Md. 612, 619, 37 A.3d 308 (2012), made this preclusive

limitation on what constitutes an "illegal sentence" crystal clear:

> "[W]here the sentence imposed is not inherently illegal, and where the matter complained of is a procedural error, the complaint does not concern an illegal sentence for purposes of Rule 4-345(a). A sentence does not become 'an illegal sentence because of some arguable procedural flaw in the sentencing procedure.'"

(Emphasis supplied; citations omitted). Johnson v. State, 427 Md. 356, 367, 47 A.3d 1002

(2012), spoke to the same effect:

> "The 'scope of this privilege ... is narrow.' To constitute an illegal sentence under Rule 4-345(a), 'the illegality must inhere in the sentence itself, rather than stem from trial court error during the sentencing proceeding.' Accordingly, 'we have denied relief pursuant to Rule 4-345(a) because the sentences imposed were not inherently illegal, despite some form of error or alleged injustice.'"

(Emphasis supplied; citations omitted).

In Matthews v. State, 197 Md. App. 365, 375, 13 A.3d 834 (2011), rev'd on other

grounds, 424 Md. 503, 36 A.3d 499 (2012), this Court also addressed Rule 4-345(a)'s

austerely limited coverage.

> "Emerging from [a] survey of a quarter of a century of Maryland caselaw is the overarching principle that the values of finality and closure still abide, Rule 4-345(a) has been consistently interpreted to be a narrow window that permits a trial judge to correct at any time a sentence that is obviously and facially illegal in the sense that it is a sentence that the court had never been statutorily authorized to impose. It is not, on the other hand, some unlimited 'Reopen, Sesame,' licensing the court to revisit and to relitigate issues that have long since become faits accompli."

(Emphasis supplied). See also Alston v. State, 425 Md. 326, 339, 40 A.3d 1028 (2012) ("[T]he most important principle is 'that, as a general rule, a Rule 4-345(a) motion to correct an illegal sentence is not appropriate when the alleged illegality "did not inhere in the defendant's sentence."'"); Montgomery v. State, 405 Md. 67, 74-75, 950 A.2d 77 (2008) ("A motion to correct an illegal sentence ordinarily can be granted only where there is some illegality in the sentence itself or where no sentence should have been imposed."); Hoile v. State, 404 Md. 591, 622, 948 A.2d 30 (2008) ("A sentence is not illegal where the 'illegality did not inhere in the defendant's sentence.'"); State v. Wilkins, 393 Md. 269, 273, 900 A.2d 765 (2006) ("A sentence that is not permitted by statute is an illegal sentence." (Citation omitted)); Randall Book Corp. v. State, 316 Md. 315, 323, 558 A.2d 715 (1989) ("[I]mproper motivation ... does not render the sentence illegal within the meaning of Rule 4-345.").

As this Court explained in Corcoran v. State, 67 Md. App. 252, 255, 507 A.2d 200 (1986):

> "The notion of an 'illegal sentence' within the contemplation of the Walczak decision deals with substantive law, not procedural law. It has obvious reference to a sentence which is beyond the statutorily granted power of the judge to impose."

(Emphasis supplied).

Chaney v. State, 397 Md. 460, 466-67, 918 A.2d 506 (2007), spoke of the distinction between "two categories of deficiency."

6

"<u>A criminal sentence may be deficient</u> and subject to being vacated on appeal <u>for a variety of reasons</u>. Through its adoption of what is now Maryland Rule 4-345 and through its decisional jurisprudence, <u>this Court has created two categories of deficiency and has treated those categories differently</u>.

***

"The <u>scope</u> of this privilege, allowing collateral and belated attacks on the sentence and excluding waiver as a bar to relief, is narrow, however. <u>We have consistently defined this category of 'illegal sentence' as limited to those situations in which the illegality inheres in the sentence itself</u>; <u>i.e.</u>, there either has been no conviction warranting any sentence for the particular offense or the sentence is not a permitted one for the conviction upon which it was imposed and, for either reason, is intrinsically and substantively unlawful. As we made clear in <u>Randall Book Corp.</u>, <u>any other deficiency</u> in the sentence that may be ground for an appellate court to vacate it – impermissible considerations in imposing it, for example – <u>must ordinarily be raised in or decided by the trial court and presented for appellate review in a timely-filed direct appeal</u>."

(Some emphasis supplied; references omitted).

In <u>Carlini v. State</u>, 215 Md. App. at 419-420, this Court was very clear with respect to the critical distinction.

"What is an illegal sentence? That all depends upon what one means by 'an illegal sentence.' <u>There are countless illegal sentences in the simple sense</u>. There are sentences that may readily be reversed, vacated, corrected or modified on direct appeal, or even on limited post-conviction review, for a wide variety of procedural glitches and missteps in the sentencing process. <u>Challenges to such venial illegalities, however, are vulnerable to such common pleading infirmities as non-preservation and limitations</u>.... <u>There are, by contrast, illegal sentences in the pluperfect sense</u>. <u>Such illegal sentences are subject to open-ended collateral review</u>. Although both phenomena may casually be referred to as illegal sentences, <u>there is a critically dispositive difference between a procedurally illegal sentencing process and an inherently illegal sentence itself</u>. It is only the later that is grist for the mill of Maryland Rule 4-345(a)[.]"

7

(Emphasis supplied; footnote omitted).

Rule 4-345(a)'s ears are thus closed to "but for" tales of woe. "But for the erroneous hearsay ruling, there would have been no sentence to be imposed." Such a plaint would come too late and would not enjoy an exemption from the ordinary filing deadline.

## Illegalities Inhering in the Sentence Itself

To recite that for Rule 4-345(a) applicability, the illegality must inhere in the sentence itself is one thing. Instinctively to be able to identify such a phenomenon is something else again. In pursuit thereof, the use of contrasting examples remains a tried and true learning technique. The most obvious example of an excessive sentence would be one that, because it is so obvious, is never actually found in the caselaw. The better to understand the category, however, it should nonetheless always be kept in mind. The paradigmatic excessive sentence would be one of eleven years in jail for a crime with a statutory maximum penalty of ten years. The penalty is excessive because it exceeds the penalty authorized by law. All other inherent illegalities are but more arcane variations on this simple theme.

A common example of an inherently illegal sentence is the very pronouncement of a sentence itself in circumstances where no sentence should have been imposed. In Alston v. State, 425 Md. 326, 339, 40 A.3d 1028 (2012), a re-sentencing of the defendant should

8

never have occurred after a post-conviction hearing had vacated the original sentence and the subsequent reconsideration of that vacating was legally unauthorized.

> "There is one type of illegal sentence which this Court has consistently held should be corrected under Rule 4-345(a). Where the trial court imposes a sentence or other sanction upon a criminal defendant, and where no sentence or sanction should have been imposed, the criminal defendant is entitled to relief under Rule 4-345(a)."

(Emphasis supplied).

Taylor v. State, 407 Md. 137, 141 n. 4, 963 A.2d 197 (2009) simply mentioned in footnote dicta that historically, "a motion to correct an illegal sentence ... was 'entertained only where the alleged illegality was in the sentence itself or the sentence never should have been imposed.'" (citation omitted). In State v. Wilkins, 393 Md. 269, 273-74, 900 A.2d 765 (2006), the Court of Appeals noted in passing that "a motion to correct an illegal sentence can be granted only where there is some illegality in the sentence itself or where no sentence should have been imposed." (Emphasis supplied). In Ridgeway v. State, 369 Md. 165, 191, 797 A.2d 1287 (2002), a confusion of counts lead to a situation in which the defendant was sentenced on three charges of assault on which he had been found not guilty. In holding such sentences to have been inherently illegal, the Court of Appeals observed, "[a] court cannot punish a defendant for a crime for which he or she has been acquitted."

An interesting variation on this theme is found in Johnson v. State, 427 Md. 356, 47 A.3d 1002 (2012), a case in which the defendant should never have been sentenced to 30 years for assault with intent to murder for the simple reason that he had neither been

9

charged with nor convicted of assault with intent to murder.[1] The sentence without an underlying conviction was inherently illegal.

In State v. Garnett, 172 Md. App. 558, 559, 916 A.2d 393 (2007), this Court held that a sentence ordering restitution should never have been pronounced against a defendant who was found to have been "not criminally responsible." Under the circumstances, the imposition of restitution, which has been deemed to be a criminal sentence, was inherently illegal. In Moosavi v. State, 355 Md. 651, 662, 736 A.2d 285 (1999), the Court of Appeals held that a sentence was inherently illegal where the defendant had been charged and convicted "under the wrong statute." And see, Campbell v. State, 325 Md. 488, 508-09, 601 A.2d 667 (1992). In Jones v. State, 384 Md. 669, 866 A.2d 151 (2005), on one of the four counts on which the defendant was apparently convicted, the guilty verdict, notwithstanding being reflected on the verdict sheet, got overlooked with respect to being orally announced in open court. The sentence on that count was held to have been inherently illegal.

Another common category of inherently illegal sentences is that in which the sentence imposes some collateral sanction that has not been authorized by the sentencing statute. It was actually this Court that blazed the trail for recognizing this variety of

---

[1] By today's standards the sentencing mistake may seem bizarre, but in 1992 it was readily understandable. Prior to the sweeping recodification of all of the assault laws in 1996, it was an easy and common mistake to conflate the inchoate crimes of attempted murder and assault with intent to murder.

sentencing illegality. Frequently, when multiple charges were brought against a single defendant for multiple crimes inflicting property damage on multiple victims, it was a common practice, simply as a matter of judicial economy, to convict the defendant of one of the crimes but then to order him to pay restitution to all of the victims. Maryland first addressed this practice in the opinion of this Court in Mason v. State, 46 Md. App. 1, 9, 415 A.2d 315 (1980). We held that "the open-ended order to make additional restitution to a wide variety of 'victims' to be determined by the probation department ... exceeded the sentencing authority of the court." (Emphasis supplied). A sentence in excess of what the legislature has authorized is, ipso facto, inherently illegal.

Five years later, the Court of Appeals confirmed Mason's result in Walczak v. State, 302 Md. 422, 488 A.2d 949 (1985). The Court of Appeals held, 302 Md. at 429: "[R]estitution is punishment for the crime of which the defendant has been convicted. Restitution depends on the existence of that crime, and the statute authorizes the court to order restitution only where the court is otherwise authorized to impose punishment." Notwithstanding Mason, Walczak became the marquee case.

Other collateral sanctions have been held to render a sentence inherently illegal where the type of sanction imposed by the sentence has not been authorized by statute. In Holmes v. State, 362 Md. 190, 763 A.2d 737 (2000), the imposition of home detention as a condition of probation was held to have been an inherently illegal sentence. "A sentence that is not permitted by statute is an illegal sentence. A defendant cannot consent to an

11

illegal sentence." 362 Md. at 195-96. (Citations omitted). <u>See also</u>, <u>Bailey v. State</u>, 355 Md. 287, 300, 734 A.2d 684 (1999) (the same).

In <u>Montgomery v. State</u>, 405 Md. 67, 81, 950 A.2d 77 (2008), the trial judge, after finding a violation of probation, imposed a sentence to be served of ten years, but deferred the reporting date of that sentence for three years with announced contingencies and dependent on the defendant's behavior. The convoluted arrangement was not authorized by statute and was, therefore, held to be an illegal sentence within the contemplation of Rule 4-345(a).

<u>Carlini v. State</u>, 215 Md. App. at 438, summed up the common characteristics of all of these examples of Rule 4-345(a) inherent sentence illegality:

> "The common denominator in all of these instances of Rule 4-345(a) sentence illegality is that <u>once the objective outer boundary markers for the sentence have been established, the illegality that inheres in the sentence itself is obvious</u>. Even if all of the antecedent proceedings had been procedurally impeccable, <u>the illegality of the sentence is facial and self-evident</u>."

(Emphasis supplied).

### Illegalities Not Inhering in The Sentence

Conversely, numerous opinions hold that although hearings on Rule 4-345(a) motions may reveal numerous procedural errors that might have called for reversals if timely raised on direct appeal, many of those errors would not be cognizable under Rule 4-345(a) because they were errors that did not inhere in the sentence itself.

12

In Randall Book Corp. v. State, 316 Md. 315, 558 A.2d 715 (1989), a bookstore convicted of selling pornographic magazines received a fine of $500 for each of 116 convictions, a penalty amounting to $58,000. The Court of Appeals held that a claim of double jeopardy, consisting of multiple punishments for a single offense, would be cognizable as an inherently illegal sentence, but further found that factually not to be the case. It noted in its discussion, however, that the "Appellant's remaining contention, that the sentencing judge was motivated by impermissible considerations, would not fall into the same category." 316 Md. at 322. Such an illegality, if arguendo assumed to be true, would be in the sentencing judge's head and not inherent in the sentence itself.

State v. Kanaras, 357 Md. 170, 742 A.2d 508 (1999) was an unusual case. The prisoner had originally been sentenced to a term of life imprisonment, which included the possibility of parole. Subsequent activities by the Parole Commission, the Commissioner of Correction, and the Governor had the effect of changing the prisoner's sentence to one of life imprisonment without the possibility of parole. The Court of Special Appeals agreed with the prisoner's claim that this governmental action had the effect of increasing the prisoner's sentence, ex post facto, and creating thereby an inherently illegal sentence pursuant to Rule 4-345(a). In reversing this Court, the Court of Appeals held that the admitted impropriety was, although illegal, was not inherent in the sentence itself.

> "The prior acts of the Parole Commission and the Commissioner of Correction, which had the effect of denying inmates in Kanaras's position the parole consideration to which they were entitled under the statutory scheme,

13

did not render illegal Kanaras's sentence. <u>The illegality was in the conduct of the Parole Commission and the Commissioner of Correction; it did not inhere in Kanaras's sentence</u>. ... <u>A motion under Rule 4-345(a)</u> to correct an illegal sentence, [ ] <u>was not an appropriate action</u>."

(Emphasis supplied).

In <u>Tshiwala v. State</u>, 424 Md. at 620, the Court of Appeals held that the alleged procedural improprieties of a sentence review panel were not cognizable under Rule 4-345(a). In <u>Chaney v.State</u>, 397 Md. at 467, a complaint that there was no evidentiary foundation for an award of restitution was not an illegality inherent in the sentence itself. <u>Baker v. State</u>, 389 Md. 127, 883 A.2d 916 (2005), was a death penalty case. Empirical studies tending to show that there was both racial and geographic bias in the imposition of the death penalty did not show any inherent illegality in the sentence itself. <u>Evans v. State</u>, 389 Md. 456, 462-65, 886 A.2d 562 (2005) (the same). <u>See also</u>, <u>Taylor v. State</u>, 407 Md. 137, 141 n. 4, 963 A.2d 197 (2009).

The Court of Appeals held in <u>Hoile v. State</u>, 404 Md. 591, 620-23, 948 A.2d 30 (2008), that a sentence imposed on the basis of a reconsideration granted in violation of the victim's statutory rights was not an illegal sentence within the contemplation of Rule 4-345(a). <u>Pollard v. State</u>, 394 Md. 40, 904 A.2d 500 (2006), dealt with a claim by a prisoner that his sentence of life imprisonment was illegal because the sentencing judge was unaware that he possessed the discretion to suspend all or part of the sentence. Such error or illegality, however, did not inhere in the sentence itself. "The sentence imposed was

14

neither illegal, in excess of that prescribed for the offense ..., nor were the terms of the sentence itself statutorily or constitutionally invalid." 394 Md. at 42. State v. Wilkins, 393 Md. 269, 900 A.2d 765 (2006) involved the same failure of a sentencing judge to realize that he possessed discretion in the imposition of a sentence. The Court of Appeals held:

> "We hold that a sentencing judge's failure to recognize his or her right to exercise discretion in the imposition of a sentence does not render the sentence illegal within the meaning of Md. Rule 4-345(a)."

393 Md. at 272. (Emphasis supplied; footnote omitted).

As we compare illegalities that are inherent in the sentence with illegalities that are not, the observation of Carlini v. State, 215 Md. App. at 431, helps to put that comparison in perspective.

> "A distinction that is sometimes difficult for the zealous advocate to appreciate is that it is not the degree or virulence of the illegality that makes one allegedly flawed sentence cognizable under Rule 4-345(a) while another (perhaps even more flagrantly flawed) is completely immune from review. Rule 4-345(a)'s threshold concern is not with the severity of the alleged infirmity but only with its situs."

(Emphasis supplied).

This then was the state of Rule 4-345(a) law through 2010. For an illegality, even when proved, to invoke the sanction of the rule, the sentence, either in its length or in its imposition of some other sanction, had to be somehow in excess of what had been expressly authorized by the legislature. The focus was on the sentencing statute itself. Courts could readily measure the sentence then being challenged against the statute. Until 2010, therefore, a Rule 4-345(a) hearing typically did not require any fact-finding. The hearing

15

was essentially limited to legal argument. With respect to such argument, it was seldom necessary to look upstream to some earlier point along the adjudicative continuum. The boundary markers that were relied upon to measure the inherent legality of the sentence were well settled and essentially immutable.

## The Cuffley Trilogy:
## From Statutory Sentencing Caps to Negotiated Sentencing Caps

In a 14-month period between October of 2010 and January of 2012, the world of Rule 4-345(a) was transformed from a relatively obscure enclave of only infrequent challenges into a beehive of adjudicative activity. This appeal is at the epicenter of that beehive. The transformative agent was a trilogy of opinions: Cuffley v. State, 416 Md. 568, 7 A.3d 557 (2010); Baines v. State, 416 Md. 604, 7 A.3d 578 (2010); and Matthews v. State, 424 Md. 503, 36 A.3d 499 (2012). ("the Cuffley Trilogy"). For the first time in a Rule 4-345(a) context, the Trilogy recognized a binding plea bargain, agreed to by a judge, as an effective modality for establishing an upper limit on a sentence. Any sentence in excess of that limit would be as inherently illegal under Rule 4-345(a) as would be a sentence in excess of a statutory limit. This was no minor change. Rule 4-345(a) was transformed from a relatively esoteric challenge to a sentence into a hub of busy post-conviction activity.

With the introduction of the plea bargain into the equation, several adjustments in Rule 4-345(a) practice became inevitable. Prior to the introduction of a plea bargain as a

16

binding upper limit on sentences, little fact-finding was required in Rule 4-345(a) cases because a controlling statute, inflexibly, was what it was. There could be little, if any, argument about the statute's very existence or about its express meaning. That world of comfortable certainty, however, now had to be left behind. Fact-finding, with all that it entails, now takes on far greater significance with sometimes the very existence of the plea agreement having to be hammered out on an ad hoc case by case basis, as well as the meaning and the understanding of the plea agreement. To what extent, moreover, will the rules of statutory interpretation or contract interpretation now come into play in interpreting a plea agreement? It is a brave new world, with many still unanswered (and some still unasked) questions.

For analytic clarity, it also behooves us to remember that in a Rule 4-345(a) case involving a plea bargain, we have not substituted a negotiated sentencing limitation for a statutory sentencing limitation. We have simply superimposed a new and secondary limitation on the older and primary limitation. Although in a plea negotiation case, attention will inevitably focus on the negotiated limitation, an illegality might theoretically inhere in a violation of either limitation. With plea bargains, we have added, not substituted an element to the mixture. See generally, Carlini v. State, 215 Md. App. at 421-22, 450-56, for where precisely restitution issues, for example, fit into the larger argument.

The promulgation of the Cuffley Trilogy was truly a watershed. The Trilogy vastly expanded the potential for legitimate Rule 4-345(a) challenges. Construing the meaning of

a plea bargain, moreover, is a far more complicated and ad hoc exercise than was ever the construing of a statute in the simpler pre-Cuffley era. Rule 4-345(a) has taken on a much larger life and Maryland law is still adjusting to it.

## The Road to Cuffley

The road to Cuffley had already been well paved by Dotson v. State, 321 Md. 515, 583 A.2d 710 (1991), though Dotson was not itself a Rule 4-345(a) case. Albeit in the context of a direct appeal rather than of a Rule 4-345(a) motion, Dotson held, effectively for the first time, that a sentence in excess of an upper limit imposed by a binding plea bargain is illegal for precisely the same reason that a sentence would be illegal if it were in excess of an upper limit imposed by statute.

The Court of Appeals emphasized the invaluable role that plea bargaining has come to play in the life of the criminal justice system. See, Santobello v. New York, 404 U.S. 257, 260, 92 S. Ct. 495, 30 L.Ed.2d 427 (1971); State v. Brockman, 277 Md. 687, 692-94, 357 A.2d 376 (1976); Banks v. State, 56 Md. App. 38, 51, 466 A.2d 69 (1983); and Sweetwine v. State, 42 Md. App. 1, 13, 398 A.2d 1262 (1979), aff'd, 288 Md. 199, 421 A.2d 60 (1980). Dotson explained that if a defendant could not depend upon judicial enforcement of the plea bargain, it would have a calamitous impact on the very institution of plea bargaining. "If a defendant could not rely upon the plea bargain, the chilling effect upon the very institution of plea bargaining would be devastating." 321 Md. at 524.

18

Turning to the plight of Dotson himself, a binding plea bargain, worked out between the defense and the State and with the full formal approval of the sentencing judge, had established that Dotson would receive a sentence of no more than 15 years for two second-degree sexual offenses. Following the acceptance of Dotson's guilty plea, the judge properly sentenced him to a term of 15 years. A subsequent sentencing review panel, however, vacated that sentence and imposed sentences yielding a total of 30 years. Dotson appealed that aggregate sentence as illegal. The Court of Appeals left no doubt that a sentencing limit imposed by a plea bargain has the same legal effect as a sentencing limit imposed by a statute, and that a sentence in excess of either limit, by a sentence review panel or by the original sentencing judge, is illegal per se.

> "Generally, the maximum sentence allowable by law is that designated by the Legislature. As we have seen, the Legislature authorized imprisonment for not more than 20 years upon conviction of a second degree sexual offense. Therefore, as a general rule, Dotson was subject to imprisonment for a total of 40 years. The convictions here, however, were obtained by guilty pleas tendered under a plea agreement. The aspect of the agreement which motivated the pleas was that if they met the required criteria for acceptance, the judge would impose a sentence not to exceed a total of 15 years. ... When the judge accepted the pleas, the agreement as to punishment came into full bloom; it stood approved by the judge. Thereafter, the agreement was inviolate, and the judge was required under the dictate of Rule 4-243(c)(3) to embody in the judgment the agreed sentence. Our rules have the force of law. It follows, that, inasmuch as 15 years was the harshest sentence that could be imposed under the circumstances, 15 years stood as the maximum allowable by law."

321 Md. at 522-23. (Emphasis supplied; citations omitted). See also, Tweedy v. State, 380 Md. 475, 479, 845 A.2d 1215 (2004) ("Because we find that the Circuit Court ... imposed

19

a sentence which exceeded the terms of the plea agreement, we shall vacate the sentence and remand for resentencing.").

In <u>Cuffley</u> the Court of Appeals built upon <u>Dotson</u> and held that once a trial judge accepts a plea agreement entered into by the defendant and the State, agreeing to be bound by its terms, any sentence then imposed in excess of that negotiated upper limit is an inherently illegal sentence under Rule 4-345(a), in exactly the same way that a sentence in excess of the statutory maximum would be.

> "We therefore hold that, regardless of whether the sentencing term is clear or ambiguous, <u>the court breached the agreement by imposing a sentence that exceeded a total of eight years' incarceration. The sentence is illegal and</u>, upon Petitioner's motion, <u>the Circuit Court should have corrected it</u> to conform to a sentence for which Petitioner bargained and upon which he relied in pleading guilty."

416 Md. at 586. (Emphasis supplied). Thus, just as a sentence of eleven years is illegal if it exceeds a cap of ten years imposed by a statute, so too is a sentence of eleven years illegal if it exceeds a cap of ten years imposed by a plea agreement.

<u>Baines</u>, decided the same day, was simply in the slipstream of <u>Cuffley</u>. In its <u>Matthews v. State</u>, however, the Court of Appeals had occasion to make explicit what in <u>Cuffley</u> and <u>Baines</u> had been only implicit. Because <u>Cuffley</u> had never expressly said that it was overruling earlier law that limited Rule 4-345(a) sentencing illegalities to breaches of the sentencing statute, the Court of Special Appeals in its <u>Matthews v. State</u>, 197 Md. App. at 377, declined to follow what it deemed to be a mere implication.

20

"In the meantime, we decline to treat as authoritative precedent what is, at most, sub-silentio implication."

This Court had held that a breach of a plea agreement with respect to sentencing did not create an inherently illegal sentence pursuant to Rule 4-345(a). It fell, therefore, to the Court of Appeals in its Matthews v. State, 424 Md. at 514, to make explicit what had theretofore been only implicit.

"To our knowledge, we have not had the occasion before now to respond directly to a fully briefed argument to that effect. So, we make clear with this opinion what we believe to be strongly suggested by our opinion in Solorzano, and stated more plainly in Cuffley, that such an illegal sentence is cognizable under Rule 4-345(a)."

(Emphasis supplied).

## A Split Sentence: Cleft for Thee

The complicating factor in Cuffley, the thing that made the plea agreement itself ambiguous, was that the case concerned a "split sentence." The plea bargain was for "a sentence within the guidelines." The guidelines in turn called for a sentence of between four and eight years. The judge sentenced Cuffley to "15 years ... all but six years suspended." The judge, the prosecuting attorney, and even the defense attorney believed that the upper limit of eight years established by the guidelines referred to unsuspended or "hard time." According to that understanding, an unsuspended term of six years would not have been in excess of the upper limit imposed by the plea bargain.

Cuffley himself, however, (and the Court of Appeals ultimately agreed with him), believed that the eight-year upper limit referred to the entire sentence in the abstract without

regard to any distinction between suspended versus unsuspended portions of it. The cutting edge of Cuffley and the part of the opinion that is critical to the case now before us, is its identification of the criteria to be used in deciding which of two or more possible interpretations of a plea agreement is the legally binding one. This is the specific problem we shall be turning to infra. This is also a type of problem in dealing with negotiated sentencing limits that would essentially never arise when dealing with statutory sentencing limits. A whole new vista of controversy has been introduced into a once far more sedate Rule 4-345(a) world.

**A Not-Guilty Agreed Statement of Facts**

The out-of-the-ordinary procedural posture of this case as it came on for its original sentencing on August 11, 2011 is a non-issue. The appellant initially waived his right to a trial by jury pursuant to Rule 4-246. Rather than engage in a contested trial in front of the judge, the appellant further agreed to submit the case to the judge on an agreed statement of facts. Taylor v. State, 388 Md. 385, 395-99, 879 A.2d 1074 (2005), clearly stated that where agreed facts are submitted, "to render judgment, the court simply applies the law to the facts agreed upon." See Bruno v. State, 332 Md. 673, 689-90, 632 A.2d 1192 (1993); Atkinson v. State, 331 Md. 199, 203 n.3, 627 A.2d 1019 (1993); Covington v. State, 282 Md. 540, 541-42, 386 A.2d 336 (1978); Barnes v. State, 31 Md. App. 25, 354 A.2d 499 (1976).

Although a defendant could choose the abbreviated trial modality for any reason or for no reason at all, it is sometimes the case, as it was here, that the defendant will agree to

22

seek a truncated trial procedure as a result of a plea negotiation. When that happens, of course, there is engaged the whole world of Rule 4-243, dealing with Plea Agreements. This then is the procedural context for the present appeal. Even more particularly, we are concerned with Rule 4-243(c)(3), which provides in pertinent part:

> "(3) Approval of plea agreement. If the plea agreement is approved, the judge shall embody in the judgment the agreed sentence, disposition, or other judicial action encompassed in the agreement[.]"

On March 2, 2011, the defense attorney for the appellant and the Assistant State's Attorney for Montgomery County, having reached an agreement, submitted to the Assignment Office of the circuit court, a signed memorandum indicating that they had agreed on a disposition of the case on two counts and requested that the case be set before the court as promptly as possible. The Memorandum fully recorded the terms of the agreement.

> "The defendant agrees to proceed by way of an agreed statement of facts on count one, amended to allege conspiracy to commit theft of property having a value at least $1,000 but less than $10,000 and on count four, alleging false statement when under arrest.

> "**CAP OF FOUR YEARS ON ANY EXECUTED INCARCERATION**.

> "Judgements of restitution totaling $8,377 will be entered as part of the sentence, not merely as a term of probation.

> "The State will enter nolle prosequi to counts two and three at sentencing.

> "The State will defer to the Court as to the defendant's bond status between the date of the trial and the date of sentencing.

> "The defendant will waive his right under Maryland Rule 4-345(e) to request modification of his sentence."

(Emphasis supplied).

The meaning of that sentencing cap on "any executed" portion of the "incarceration" is the core issue of this appeal.

## The Trial and the Sentence

The hearing on the acceptance of the appellant's plea, and the subsequent trial itself, were held on April 18, 2011. The appellant was found 1) guilty of conspiracy to commit theft of property with a value of at least $1,000 and 2) guilty of making a false statement when under arrest. Our concern is only with the subsequent sentence on the first of those two counts. It was four months after the trial on the agreed statement of facts that the court imposed the sentence. At the outset of the August 11, 2011 sentencing hearing, the Assistant State's Attorney reminded the judge of the plea bargain to which the judge had earlier given his approval.

"In this case, Your Honor agreed to a cap of four years of any executed incarceration."

(Emphasis supplied).

After an extended discussion of other sentences the appellant was facing in Washington County on a series of recent but unrelated convictions, the court pronounced his sentence in this case.

"Now, on the first Count, conspiracy to commit theft, the Court will impose a sentence of 10 years to the Maryland Department of Corrections; I'll suspend all but four years and that will be concurrent with the sentence in the Hagerstown case.

24

"Now, with the false statement in violation of section 9-501 of the criminal law article, the Court will impose a sentence of six months, which is the maximum sentence in that particular case, and that will be concurrent with the sentence in Count 1. Upon release, the defendant will be on a period of four years supervised probation. All standard conditions of probation apply."

(Emphasis supplied).

## The Argument In a Nutshell

The appellant now contends that the "cap of four years on any executed incarceration" meant a cap of four years on the entire sentence, unsuspended and suspended portions alike, and that the total sentence of 10 years was, therefore, an illegally excessive sentence. The appellant invokes the Cuffley Trilogy of cases in support of his argument. The State's counter-contention is that a cap on "executed incarceration" is a cap only on that portion of the total sentence that is unsuspended, and that the sentence with all but four years suspended is, therefore, a legal sentence within the contemplation Rule 4-345(a). The State also invokes the Cuffley Trilogy of cases in support of its argument. Our mission, therefore, is to determine de novo, as a matter of law, what the term "cap of four years on any executed incarceration" meant in the plea bargain that was before the court in this case.

## How to Construe a Plea Bargain

Although negotiating a private contract and negotiating a guilty plea are by no means identical exercises, there is nonetheless a strong overlapping and symbiotic relationship between them. The caselaw, however, has had some trouble with the relationship. Virtually every statement in the case law pays lip service to that relationship as it begins its discussion by affirming the strong relationship, but then it immediately

25

disavows the potency of that relationship. State v. Parker, 334 Md. 576, 604, 640 A.2d. 1104 (1994) is a case in point:

> "We agree that contract principles should generally guide a determination of the proper remedy of a broken plea agreement. We also agree, however, with the Court of Special Appeal's recognition that contract principles alone will not suffice."

(Emphasis supplied). See also, United States v. Olesen, 920 F.2d 538, 541-42 (8th Cir. 1990) ("Plea agreements are like contracts, but they are not contracts; although contract doctrine may be helpful, due process requires a deviation from normal commercial contract law.").

Solorzano v. State, 397 Md. 661, 668, 919 A.2d 652 (2007) speaks with the same mixed voice.

> "Because plea bargains are similar to contracts, 'contract principles should generally guide the determination of the proper remedy of a broken plea agreement.' Contract principles alone, however, are not enough to resolve disputes over the proper interpretation of a plea bargain."

(Emphasis supplied; citations omitted). See also, Jackson v. State, 358 Md. 259, 275, 747 A.2d 1199 (2000). Cuffley v. State, 415 Md. at 579-80, recognized the salutary guidance of contract principles, but disavowed the dispositive powers of those principles:

"Plea bargains are likened to contracts. Consequently, 'contract principles should generally guide the determination of the proper remedy of a broken plea agreement.' Contract principles, however, are not enough to resolve disputes over the proper interpretation of a plea bargain."

(Emphasis supplied).

Between the plea bargain and the contract there is an enigmatic attraction-but-rejection relationship. In these "yes, but" discussions the reader is very much left at sea. Shall we swim to the shore – or back to the ship? This indeterminate status of principles of contract interpretation can create a troubled middle ground when it comes to applying the principles to a given plea agreement. In terms of sometimes lacking analytic balance on the subject, appellate opinions themselves have not been without sin. Those opinions holding a defendant not bound by the arguably binding terms of his plea agreement stress the dissimilarities between the two contexts and tend to ignore totally the similarities that might cut the other way. Conversely, the opinions holding a defendant bound by the terms of the plea agreement stress the similarities between the two contexts and tend to ignore the dissimilarities. What is desperately needed is the appreciation that 1) the construing of a plea agreement is not, to be sure, slavishly controlled by contract principles but that 2) contract principles may nonetheless control a given outcome and may not be blithely repudiated or ignored.

**The Prime Directive:**
**The Overarching Significance of the Words Themselves**

One interpretative principle is transcendent. The prime directive for statutory construction, for contract construction, and now for the construction of a plea agreement is

simply to read the words themselves that call for construction. If their meaning is clear and distinct and undisputed, the interpretive exercise is over. This is the core principle for construing the meaning of any contract.

In General Motors Acceptance Corp. v. Daniels, 303 Md. 254, 261-62, 492 A.2d 1306 (1985), the Court of Appeals set out unequivocally what Maryland law has always been with respect to construing the terms of a contract:

> "It is well settled that Maryland follows the objective law of contracts. A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away to what the parties thought the agreement meant or intended it to mean."

(Emphasis supplied; citation omitted).

The prism through which the words of the agreement are to be viewed is that of "a reasonable person in the position of the parties." If the language of the agreement, be it oral or written, is clear and unambiguous, there is no need to look outside the four corners of that language for interpretative support. The initial question of whether the words of the contract are ambiguous is one of law for the court to review de novo. In Towson University v. Conte, 384 Md. 68, 78, 862 A.2d 941 (2004), the Court of Appeals explained:

> "The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law, subject to de novo review. Maryland courts follow the law of objective interpretation of contracts,

28

giving effect to the clear terms of the contract regardless of what the parties to the contract may have believed those terms to mean."

(Emphasis supplied; citations omitted).

Kasten Constr. Co., Inc. v. Rod Enterprises, Inc., 268 Md. 318, 328-29, 301 A.2d 12 (1973) was equally emphatic.

"[W]hen the language of a contract is clear, the true test of what is meant is not what the parties to the contract intended to mean, but what a reasonable person in the position of the parties would have thought it meant."

(Emphasis supplied). See also, Brendsel v. Winchester Constr. Co., Inc., 392 Md. 601, 624, 898 A.2d 472 (2006) ("Only when the language of the contract is ambiguous will we look to extraneous sources for the contract's meaning.") (Emphasis supplied).

In Son v. Margolius, 114 Md. App. 190, 212-13, 689 A.2d 645 (1997), rev'd on other grounds, 349 Md. 441, 709 A.2d 112 (1998), this Court held:

"Because such a contract, if it existed, was most likely oral, varying standards of construction apply. Interpretation of a written contract proceeds in two phases. A court must first determine if the contract is ambiguous. If the contract is unambiguous, then the court must determine the meaning of the contract as a matter of law. The parties are then presumed to have intended what they expressed in the language of the agreement. Their actual intent, therefore, is not considered. When a written agreement is ambiguous, a court must resort to the rules of contract construction and may also consider extrinsic evidence. Likewise, when parties disagree as to the existence or terms of an oral agreement, their conduct and intentions may be employed to determine any ambiguous and unknown provisions of the contract."

(Emphasis supplied). See also, Calomiris v. Woods, 353 Md. 425, 436, 727 A.2d 358 (1999) ("A court is to determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.") (Emphasis supplied).

29

In <u>Rankin v. State</u>, 174 Md. App. 404, 408-09, 921 A.2d 863 (2007), this Court also stated:

> "The law is well settled that, <u>in the absence of any jurisdictional defect</u>, <u>such</u> <u>[plea] agreements are based on contract principles</u>.... <u>The words employed in</u> <u>the contract are to be given their ordinary and usual meaning</u>, in light of the context within which they are employed."

(Emphasis supplied). And see, <u>Hillard v. State</u>, 141 Md. App. 199, 207, 784 A.2d 1134 (2001). In <u>Ridenour v. State</u>, 142 Md. App. 1, 5-6, 787 A.2d 815 (2001), this Court spoke very forcefully on this issue.

> "A plea agreement is a contract between the defendant and the State. <u>In</u> <u>determining the meaning of a plea agreement, we apply the principles of</u> <u>contract interpretation</u>. Recently, the Court of appeals in <u>Wells v. Chevy</u> <u>Chase Bank, F.S.B</u>, 363 Md. 232, 250, 768 A.2d 620 (2001), summarized these principles as follows:
>
> > "<u>In determining the meaning of contractual language,</u> <u>Maryland courts have long adhered to the principles of the</u> <u>objective interpretation of contracts</u>. Under the objective interpretation principles, <u>where the language employed in a</u> <u>contract is unambiguous</u>, <u>a court shall give effect to its plain</u> <u>meaning and there is no need for further construction by the</u> <u>court</u>."

(Emphasis supplied; some citations omitted). And see, <u>Ogonowski v. State</u>, 87 Md. App. 173, 182-83, 589 A.2d 513, <u>cert. denied</u>, 323 Md. 474, 593 A.2d 1127 (1991).

## The Sentence Cap Was Clear and Unambiguous

We repeat the words of the plea agreement in this case, as memorialized in the formal written Memorandum submitted to the court and as then orally repeated by the Assistant State's Attorney and the court at the outset of the plea hearing and the trial on April 18, 2011:

30

## CAP OF FOUR YEARS ON ANY EXECUTED INCARCERATION

We hold that the meaning of those words is perspicaciously clear and unambiguous. They mean four years to be served in jail. They mean four years of "hard time." They make no reference whatsoever to any suspended sentence and, indeed, distinguished themselves from it. They could not reasonably be interpreted by anyone to make such reference. Indeed, the term "executed incarceration" negates any reference to unexecuted incarceration.

The perennial flaw with most non-specific sentencing caps imposed on split sentences is that the ostensibly limiting cap provision does not indicate which part of a split sentence is being capped. A non-specific cap leaves open the possibility that the entire sentence (the unsuspended and the suspended portions alike) is being capped rather than that only the "hard time" is being capped. In that regard, our present case stands in stark contrast to all three cases in the Cuffley trilogy. In all three cases, the cap was upon the sentence generally with no express indication as to whether the cap was only on the executed portion of the sentence or also on the suspended part of the sentence. Those three sentencing caps were accordingly ambiguous by definition. To resolve that ambiguity, it became necessary to turn to extrinsic evidence, including most significantly the understanding or the intent of the defendant himself (or, more accurately, a reasonable lay person in the shoes of the defendant, of which more infra). In the present case, there was no such ambiguity and no reason to turn to any extrinsic evidence to resolve ambiguity. One does not need to resolve non-ambiguity.

In our case, the distinct parts of the split sentence are "executed incarceration," on the one hand, contrasted with "unexecuted incarceration," on the other hand. Webster's Unabridged Dictionary (5th Ed.) gives as definitions of "executed": "carried out, performed"; and as definitions of "unexecuted": "not carried out, unperformed." There is no ambiguity in contrasting "incarceration that is carried out" with "incarceration that is not carried out" or in contrasting "performed incarceration" with "unperformed incarceration." This is no mere undifferentiated "sentence within the guidelines." There is even a suggestion in Cuffley, 424 Md. at 524, that an adjective (past participle) such as "executed" is exactly what the plea bargain in that case needed to dissipate any possible ambiguity:

> "Neither did the State, defense counsel, or the Court explain for the record that the words 'guideline range' referred solely to executed time."

(Emphasis supplied).

Finding no ambiguity in the critical terms of the plea bargain in this case, we hold that there was no reason to look elsewhere to resolve an ambiguity. No ambiguity existed. It is, moreover, hornbook law that extrinsic sources of evidence that may be helpful in resolving an ambiguity, when it actually exists, may not be used to create an ambiguity in the first instance.

## The Man on the Clapham Omnibus

Even if we were to assume, purely arguendo, that the term "executed incarceration" might refer ambiguously to the suspended or unexecuted portion of a split sentence as well as to that portion of the sentence actually to be served, it would avail the appellant naught.

32

In those situations where the terms of the plea agreement itself are ambiguous, it would become necessary to look to extrinsic evidence to resolve the ambiguity. That is the circumstance in which the defendant himself and his understanding might play a role in the interpretive process. The earlier caselaw did, to be sure, seem to take a strong tilt of deference toward the appellant's own subjective understanding of what his plea bargain actually meant. Solarzano v. State, 397 Md. at 668, stated that the terms of a plea agreement are to be construed "according to the reasonable understanding of the defendant when he pled guilty."

There lurked, of course, in that initial deferential tilt as to whose understanding of the plea agreement would prevail such a potentially counterproductive danger that the law could not allow those early statements to be carried to the limits of their logic. A defendant's understanding of what he agreed to might be paramount, but could the law trust the defendant to tell us what his understanding really was? Any savvy prisoner who challenges the legality of his sentence under Rule 4-345(a), after ruminating for 15 years after his guilty plea and the imposition of the sentence, will know full well what his purported understanding of his plea bargain will now have to be in order to make the sentence in ostensible excess of that plea agreement illegal. The prisoner to whose understanding we would defer, therefore, would be in the almost incontrovertible position of deciding his own Rule 4-345(a) motion. The caselaw, whatever to the contrary it may apparently have said along the way, could not fall for so transparent a ruse.

Alert to the problem, <u>Cuffley</u> came up with the ultimate solution by devising a way to defer to the defendant's bargaining predicament without deferring to the defendant's testimonial credibility. The deference will be only to the defendant as an abstraction. The magnificently clever solution was to substitute for the defendant, of palpably shaky reliability, a more trustworthy stand-in. <u>Cuffley</u> pioneered the substitution and introduced into Rule 4-345(a) jurisprudence the legendary "reasonable man," that salutary legal fiction whom the British cousins call "the man on the Clapham omnibus."[2] The understanding of the terms of the deal by the defendant who entered the plea as his part of the deal may remain a dominant factor. Rather than accept <u>the defendant's subjective version</u> of what his understanding actually was, however, we prefer to determine <u>objectively what a reasonable non-lawyer's version</u> of the deal would have been under circumstances similar to those of the defendant, confining the knowledge of that hypothetical reasonable man to that which was formally on the record of the hearing on the acceptance of the plea. In effect, the appellate court, applying the prescribed criteria and then making a <u>de novo</u> objective determination, plays the role of the reasonable man.

In the words of <u>Cuffley</u>, 416 Md. at 581, "Whether a trial court has violated the terms of a plea agreement is a question of law, which we review <u>de novo</u>." Implicit in that statement is that the appellate court makes the <u>de novo</u> determination, as a question of law, as to what the terms of a plea agreement actually were. Applying the prescribed criteria,

---

[2]Clapham Junction is a busy commercial neighborhood and a major tube stop in south London.

the appellate court, in effect, becomes the reasonable man. <u>Cuffley</u> aptly described the now

reliable lens through which the appellate court will view the terms of a plea agreement:

> "<u>The test for determining what the defendant reasonably understood</u> at the time of the plea <u>is an objective one</u>. <u>It depends not on what the defendant actually understood</u> the agreement to mean, <u>but rather, on what a reasonable lay person</u> in the defendant's position and unaware of the niceties of the sentencing law <u>would have understood the agreement to mean</u>, based on the record developed at the plea proceeding. It is for this reason that <u>extrinsic evidence of what the defendant's actual understanding might have been is irrelevant to the inquiry</u>."

416 Md. at 582. (Emphasis supplied).

In terms of limiting the information that the reasonable man may consider to what

is on the record as part of taking the plea, <u>Cuffley</u> went on, 416 Md. at 584:

> "<u>All that is relevant</u>, for purposes of identifying the sentencing term of the plea agreement, <u>is what was stated on the record at the time of the plea</u> concerning that term of the agreement <u>and what a reasonable lay person in the Petitioner's position would understand</u>, based on what was stated, the agreed-upon sentence to be."

(Emphasis supplied).

<u>Baines</u>, 416 Md. at 619, reiterated that definition of a reasonable lay person in the

defendant's position at the time of the plea.

> "<u>Cuffley</u> makes clear that <u>none of that extrinsic evidence of Petitioner's actual understanding of the plea agreement is relevant to the determination of the plea agreement's terms</u>. <u>That determination</u>, we held in <u>Cuffley, is measured by what a reasonable lay person</u> in Petitioner's position at the time of the plea <u>would have understood the agreement to be</u>. Consequently, the only relevant facts concerning the sentencing term of the plea agreement are those that are manifest from the record of the plea proceeding."

(Emphasis supplied). See also, <u>Matthews v. State</u>, 424 Md. at 524 (The terms of the agreement must be "viewed through the prism of the objectively reasonable lay defendant.").

We rely upon the reasonable man to tell us what the defendant probably really understood rather than upon the defendant's possibly biased and self-serving version of what he would like us to believe he understood. In the last analysis, we are only deferential to the defendant's objective manifestation (as a reasonable man) and not to his subjective manifestation (through his own testimony). That salutary substitution essentially eliminates the potential harm. The reasonable man, after all, does not delude us with self-serving testimony.

A word more about the reasonable man. In the context of interpreting plea agreements, of course, he is a non-lawyer with no sophisticated legal training of any sort. His knowledge is circumscribed, moreover, by what he can see and hear on the record in the course of the plea bargaining process itself, largely (if not entirely) at the hearing on the acceptance of the plea. His circumstances, moreover, are comparable to those of the appellant himself. Whether that implies that he is, therefore, a criminal defendant is by no means clear.

Who then is the reasonable man? Most significantly, how well or how ill does he handle the English language? Defense counsel harshly denigrates him in the context of his competency to understand the terms of a plea agreement, consigning him to the depths of borderline illiteracy. Counsel contends that the plea agreement in this case was <u>ipso</u> <u>facto</u>

36

ambiguous because the past participle "executed" was too difficult a word for the appellant himself to wrap his brain around. The appellant never told us that, of course, but we are asked to surmise it. The necessary next step in the appellant's thesis is that if the appellant does not understand the word, neither would any reasonable lay person in the appellant's circumstances. Counsel doth, we think, protest too much. Even were we to attribute to our reasonable man the stigma of being a criminal defendant, we will not assume that he is thereby an untutored sluggard.

As we undertake our Promethean task of creating a fictive reasonable man and equipping him with reasonable linguistic attributes or even if our task were restructured to one of creating a reasonable member of a reasonable den of thieves, we know of no precedential authority that would forbid us to cast Fagin himself or at least Jack Dawkins (the glib Artful Dodger) in the role and that would restrict our choice to the lumpish Bill Sykes.[3] To the extent to which our profile of the literacy of the reasonable man might arguably be influenced in any way by the profile of the appellant himself, the circumstances of the appellant's original conviction of conspiracy to commit theft of the value of at least $1,000 reveal a sophisticated criminal involved in a clever scheme of using counterfeit credit cards to commit large scale theft. Ray v. State, 206 Md. App. 309, 47 A.3d 1113 (2012). The appellant was by his actions far more a Fagin than he was a Bill Sykes.

---

[3] A significant part of the cast in Charles Dickens's Oliver Twist (1938).

37

We will endow our reasonable man (even if a reasonable criminal defendant) with at least a modicum of literacy, enough to handle comfortably the past participle "executed." He is thereby competent to understand the term of the plea bargain imposing a cap on the sentence, just as all of the other parties understood that term. Thus, what appeared to be a very complex case is very simply resolved. Game! Set! Match!

The competence of the reasonable man to understand the terms of the plea agreement was reinforced, moreover, by the circumstances of the April 18, 2011 hearing at which the plea was entered. That hearing essentially circumscribes the universe of knowledge available to the reasonable man as he forms his understanding of the terms of the agreement. The full terms of the plea agreement had been reduced to a formal Memorandum that had earlier been submitted to the court. As the appellant stood before the court and was questioned by the judge about the voluntariness of his plea, the subject of the plea agreement was raised. The judge, with the Memorandum before him, read the key terms of the agreement into the record:

> "[DEFENSE COUNSEL]: I don't know that we put the terms of the plea actually on the record.
>     "THE COURT: The terms of the plea are that the defendant agrees to proceed by way of an agreed statement of facts on Count 1, amended to allege conspiracy to commit theft of property having a value of at least $1,000 but at less than $10,000.
>
> "And on Count 4, alleging false statement when under arrest. There's a cap of four years [on executed][4] incarceration. The State will enter a nolle

---

[4]The court reporter made an obvious error in transcription and wrote "un-executed incarceration" instead of "on executed incarceration." All parties were in absolute agreement that the judge said "on executed incarceration," exactly as it was written in the formal Memorandum.

prosequi to Counts 2 and 3 at sentencing, and the State will defer to the Court as to defendant's bond status between the date of trial and the date of sentencing.

"The defendant will waive any right under Maryland rule 4-345(e) to request a modification of his sentence.

"Are those the complete terms of the statement?

"[DEFENSE COUNSEL]: They are, Your Honor."

(Emphasis supplied).

Defense counsel immediately turned to the appellant and confirmed that what the judge had said about the agreement was precisely what the appellant and defense counsel had discussed:

"[DEFENSE COUNSEL]: Mr. Montgomery, understanding those terms of the agreement ... are those the terms of the plea agreement that you and I discussed?

"[THE APPELLANT]: Yes."

(Emphasis supplied). The reasonable man, observing that exchange, would have been in a position to infer that the key party to the plea agreement was, sub silentio, acquiescing in the common understanding of what the words of the agreement said.

Because our reasonable lay man in the circumstances of the appellant was hypothetically endowed with the powers to see everything and to hear everything that took place at the April 18, 2011 hearing, he might have made one other interesting observation that could at least have reinforced the conclusion he had already reached about the nature of the plea agreement. One of the lesser provisions of the agreement was that the appellant would be permitted to remain out on the street on bail between the acceptance of the plea

39

agreement (in April) and his sentencing in August. What the reasonable man might have noticed was that the appellant was no mere passive observer but was keenly interested in "street status" as opposed to "jail status," more than in some long-term status of an abstract sentence:

> "[THE APPELLANT]: <u>What was it about the bond issue</u>?
>
> "[DEFENSE COUNSEL]: The bond is that <u>the State's not going to be asking to have your bond revoked</u> –
>
> "[THE APPELLANT]: <u>Okay</u>.

"[DEFENSE COUNSEL]: – (unintelligible)

"THE COURT: Whether you stay out of jail between now and the time you get sentenced or not, <u>the State is not going to request that you be locked up while you're waiting for sentencing, okay</u>?

"[THE STATE]: That's correct.
      "[THE APPELLANT]: <u>Yes, sir</u>."

(Emphasis supplied).

The reasonable man might have inferred from that exchange that even with respect to the ultimate sentence itself, the critical term that the appellant, among others, had hammered out was a term focused more on "hard time" than on the sentence in the abstract. Such an inference, however, would have been only peripheral reinforcement for the reasonable man's determination and is not pivotal in our decision.

## Conclusion

Maryland Rule 4-345(a) has come a long way since 1951. It is a far more significant body of law today than it was then. After burnishing the critical distinction between an

40

illegality inherent in the sentence itself and other lesser illegalities, it expanded massively by embracing plea agreements as well as statutes as sentencing caps. It took on significant new complexity as it then ventured into the briar patch of split sentences. The critical fault line of the moment is that of construing the meaning of a plea agreement and the newly found instrumental utility of the reasonable man in performing that function. Emerging from this kaleidoscopic maze of issues is our conclusion that the sentence under immediate review was not inherently illegal and that the court was, therefore, correct in denying the appellant's Rule 4-345(a) motion.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY THE APPELLANT.**