Circuit Court for Baltimore County
Case No. 03-K-12-004853 (Butler)
Case No. 03-K-12-004851 (Duncan)

**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1004

September Term, 2015

CLIFFORD BUTLER

v.

STATE OF MARYLAND

No. 1104

September Term, 2015

DERIUS DUNCAN

v.

STATE OF MARYLAND

Meredith,
Graeff,
Raker, Irma S.
    (Senior Judge, Specially Assigned),

JJ.

Opinion by Meredith, J.

Filed: February 2, 2017

These consolidated appeals arise out of the convictions of Derius Duncan ("Duncan") and Clifford Butler ("Butler"), appellants, for various crimes stemming from the murder of Ronald Givens ("Givens") on October 3, 2011. Appellants were jointly tried in the Circuit Court for Baltimore County beginning on April 28, 2015, and were each convicted of first degree murder of Givens, conspiracy to commit Givens's murder, influencing a witness, and use of a firearm in commission of a crime of violence. Their timely appeals were consolidated.

## QUESTIONS PRESENTED

Duncan presents the following three questions for our review:

> 1. Whether the trial court erred in denying severance of [Duncan's] trial from his co-defendant [Butler] when the State intended to introduce a confession of the non-testifying co-defendant that implicated Appellant during the trial[.]
>
> 2. Whether the trial court erred in denying [Duncan's] multiple motions for mistrial after the State used a non-testifying co-defendant's confession during trial that implicated [Duncan.]
>
> 3. Whether the trial court erred in permitting admission of other crimes evidence in the form of a handgun allegedly possessed by [Duncan] in an unrelated crime and permitting that handgun to be shown to the jury[.]

Butler presents only one question for our review:

> 4. Did the lower court err in allowing the State to use Mr. Butler's statements made during two proffer sessions against him at trial?

We answer "Yes" to Question 2 and Question 4, and we will reverse both appellants' convictions and remand both cases to the Circuit Court for Baltimore County for new trials. We need not answer Questions 1 and 3.

## FACTUAL & PROCEDURAL BACKGROUND

### The Traffic Stops of Ronald Givens and Derius Duncan

The events giving rise to this appeal began on March 22, 2011. At around 9:00 p.m. that evening, Baltimore City Police Officer Steffon Scott was on patrol with his partner in southwest Baltimore when he observed a black PT Cruiser automobile parked "in an unusual spot." Officer Scott stopped his patrol car to observe the vehicle, and observed a man "jump out" of the passenger side of the vehicle and run out of sight. The PT Cruiser then drove down the street, prompting Officer Scott to follow, and eventually pull over, the vehicle. Upon pulling the vehicle over, Officer Scott encountered Ronald Givens, who was the driver. There were no other individuals in the vehicle with Givens at this time. During the traffic stop, Officer Scott smelled marijuana and observed marijuana within the vehicle. Officer Scott requested that Givens step out of the vehicle so that he could ask Givens some "routine questions." Officer Scott and his partner then searched the vehicle, including the glovebox, and confiscated the marijuana they found, but they did not issue Givens a citation. Officer Scott concluded the traffic stop by telling Givens that he was "done hacking for the night" and that he needed to leave the area.[1]

Roughly 25 to 30 minutes later, Officer Scott again observed the same black PT Cruiser traveling in the neighborhood where the first encounter with Givens had occurred. Officer Scott observed the PT Cruiser pull over to the side of the street, at which point an individual approached and entered the vehicle. Officer Scott noticed that the individual was

---

[1] "Hacking" is a term used to describe the operation of an unlicensed taxi service.

2

"like holding his waistband." Based on the individual's appearance, Officer Scott believed that it was the same person who had previously jumped out of the passenger side of the vehicle when Officer Scott had first observed Givens's vehicle. Officer Scott followed Givens's vehicle, and initiated a second traffic stop by turning on his lights and siren. Officer Scott additionally activated a "spotlight" on his vehicle so that he could "clearly see anything [that was] going on inside the vehicle." As Officer Scott approached the vehicle on foot, he observed the passenger "motion towards the glovebox" and then close the glovebox.

Officer Scott instructed Givens and the passenger (later identified as Duncan) to exit the vehicle. Officer Scott searched the glovebox, and found a loaded black handgun which had not been in the glovebox during the search of the vehicle 30 minutes earlier. Duncan was arrested and later charged with illegal possession of the handgun. Duncan's trial on those charges was scheduled for October 26, 2011.

### Ronald Givens's Death

On the morning of October 4, 2011, a neighbor of Ronald Givens found him lying face down on his front lawn with no pulse. The neighbor testified at appellants' trial that she had heard what she thought was a series of "cherry bombs" at roughly 9:00 p.m. the previous evening, but thought nothing more of it after the sounds ceased. After discovering Givens on the morning of October 4, the neighbor called 9-1-1. A Baltimore County police officer dispatched in response to the call discovered that Givens had multiple bullet wounds in his torso.

3

Detective Brian Wolf, from the Homicide Division of the Baltimore County Police Department, was assigned to be the lead detective for the investigation of Givens's death. Detective Wolf arrived at the crime scene at approximately 8:15 a.m. on October 4. Once at the crime scene, Detective Wolf spoke with Givens's mother. During their conversation, Givens's mother provided Detective Wolf a subpoena Givens had received from the Circuit Court for Baltimore City. The subpoena ordered Givens to appear as a witness for the State in the case of "State of Maryland v. Derius Duncan" on October 26, 2011. During the course of Detective Wolf's investigation, he later learned that Duncan was on probation at the time he was charged with illegal possession of the handgun, and was therefore facing fifteen years of additional incarceration if found to be in violation of conditions of his probation.

After investigating the crime scene and meeting with Givens's mother, Detective Wolf contacted the "Diagnostic Center" in Baltimore City, where Duncan was being held pending his trial for the illegal handgun charge. Detective Wolf requested that the officers at the Diagnostic Center search Duncan's cell. After the search was completed, Detective Wolf was provided with copies of documents found in Duncan's cell. This included a piece of paper with "a lot of phone numbers," in addition to "a name with two addresses underneath of that." The name written down by Duncan was "Dave," which Detective Wolf later determined was a reference to Butler's nephew David Johnson.

Detective Wolf also obtained a subpoena for records of phone calls made by Duncan while he was incarcerated. Detective Wolf listened to over 100 calls Duncan had made during his incarceration. The Detective determined that 19 of the calls were relevant to the

4

investigation of Givens's murder. Clifford Butler's voice was heard on several of the calls made by Duncan.

## Butler's Offers of Cooperation

Detective Donald Anderson was assisting Detective Wolf in his investigation of Givens's murder. At the time Detective Anderson first interviewed Clifford Butler regarding Givens's death, Butler was not incarcerated, and had not been subpoenaed to appear for any matter. Nevertheless, counsel for Butler contacted Detective Anderson and requested a meeting to discuss the Givens case. That contact resulted in Butler entering into a proffer agreement with the State which provided, in relevant part:

> **1.     Except as otherwise provided in paragraphs two and three, no statements made or other information provided by you or your attorney during the proffer will be used against you in any criminal trial.**
>
> 2.     You agree that the State may make derivative use of, and may pursue, any investigative leads suggested by any statements made or other information provided by you or your attorney during the proffer.
>
> 3.     Your complete truthfulness and candor are express material conditions to the undertaking of the State set forth in this letter. Therefore, the State may use statements made or other information provided by you or your attorney during the proffer under the following circumstances. . . .
>
> * * *
>
> > **b.     If the State should ever conclude that you have knowingly withheld material information from the State or otherwise have not been completely truthful and candid with the State, the State may use any statements made or other information provided by you or your attorney during the proffer against you for any purpose. If the State does ever so conclude, it will notify you prior to making any such use of any such statements or other information.**

(Emphasis added.)

5

The proffer agreement was read and explained to Butler, and was signed and dated by Butler, his attorney, and the prosecutor during a proffer session on December 1, 2011. A copy of the agreement was again read and initialed at a second proffer session on December 5, 2011.

During the first proffer session, Butler was not "completely truthful and candid with the State." Butler had indicated that three individuals were involved in the murder of Givens: Derius Duncan, Darren Thomas, and Keon Beads. Toward the beginning of the December 1 proffer session, Butler indicated that he had not been personally involved in the murder. Butler explained that the jail calls on which his voice could be heard, and a letter exchanged between him and Duncan, concerned a drug transaction and trying to persuade Givens to provide exculpatory testimony at Duncan's trial on the handgun charge, but did not include discussions of actually harming or killing Givens. However, later during the December 1 proffer session, Butler stated that he had been in contact with Darren Thomas on Duncan's behalf regarding the Givens case. By the end of the first proffer session, Butler acknowledged that he had, in fact, asked Darren Thomas to either harm or kill Givens. Butler further stated that he had been told that the murder of Givens had been carried out by Keon Beads.

Based on Butler's statements during the December 1 proffer session, Detective Anderson took numerous steps to try to corroborate the information provided by Butler, including interviewing Darren Thomas, subpoenaing phone records, and eventually, issuing a grand jury subpoena for Thomas. Based on their investigations following the first

6

proffer session, Detectives Anderson and Wolf believed that Butler had made false statements during the first proffer session.

But, at the request of Butler's attorney, a second proffer session was held on December 5, 2011. According to Detective Anderson, Butler was made aware at the outset of the second proffer session that, "if he'd already lied that the [proffer agreement] would in some sense already be breached." Detective Anderson testified that Butler was told that, if he "continued to lie," the State would be able to use his statements against him. But Detective Anderson also acknowledged in his testimony at a hearing regarding the use of Butler's statements that everyone "started fresh" on December 5:

> Q [COUNSEL FOR BUTLER]: So wouldn't you say, detective, at this point in time you started fresh? You believed that Mr. Butler had told you a lie, you asked him to tell you the truth in the second proffer; correct?
>
> A [DETECTIVE ANDERSON]: Yes.
>
> Q: And you said if he didn't tell you the truth now the State could use it against him; correct? Correct?
>
> A: Yes, it's in the agreement.

A second proffer agreement – which appears to be a photocopy of the December 1 proffer agreement – was initialed by all parties at the beginning of the second session and dated "12/5/11."

At the December 5 proffer session, Butler told Detective Anderson that Keon Beads had offered Givens drugs and money to induce Givens to change his testimony or not show up in court for Duncan's trial on the handgun charges. Butler also changed his account of Darren Thomas's role in Givens's murder. Butler told Detective Anderson at the

7

December 5 session that Thomas had refused to be involved in the Givens matter, and that Butler had asked his nephew David Johnson to carry out the murder. Butler told Detective Anderson that he had given Johnson certain information pertaining to Givens, such as a description of his car and his address, during a meeting to plan the murder. Butler also told Detective Anderson that he had received two letters, rather than one, from Duncan discussing hurting or killing Givens. According to Detective Anderson, Butler also changed his prior statement regarding the identity of the person who had told him of Givens's murder, stating at the December 5 proffer that he learned of the murder from David Johnson himself, not Keon Beads. Following the December 5 proffer session, Detective Anderson concluded that Darren Thomas had no involvement in the murder of Givens, and Anderson believed that, in addition to Duncan and Butler, David Johnson and Keon Beads had been involved in the murder as Butler had said on December 5.

**The Charges, Request for Severance, and Trial**

Duncan and Butler, as well as David Johnson and Keon Beads, were all charged with various crimes arising out of the October 4, 2011, murder of Givens. On April 7, 2015, a pretrial hearing was held in the Circuit Court for Baltimore County, at which time the court considered Duncan's motion for severance of his trial from the trials of both Butler and Johnson. The State agreed that severance of Johnson's trial was appropriate, but argued that there was no need to conduct separate trials of Duncan and Butler. As we will discuss in more detail later in this opinion, based upon assurances from the prosecutor, the circuit court denied Duncan's motion for severance of his trial from that of Butler.

8

Later, immediately prior to jury selection, the court considered the State's motion *in limine* for permission to introduce evidence of any statements Butler made during the proffer sessions. The State argued that, because Butler had made false statements to Detective Anderson during the first proffer session, the terms of the proffer agreement permitted use of any statements made during the proffer sessions. Butler opposed the State's motion, arguing that he had been given a "fresh start" at the second proffer session in exchange for the information he provided that proved useful to the State, and that the premise of participating in the second proffer session was that any lies he had told during the first session would be forgiven if he was truthful during the second session. Following a hearing on the matter, the circuit court ruled in favor of the State, finding that Butler had clearly breached the proffer agreement by lying during the first proffer session. Consequently, the court ruled that, under the terms of the proffer agreement, the State could introduce any statements Butler had made.

Following a multi-day trial, appellants were each convicted of first degree murder, conspiracy to commit murder, influencing a witness, and use of a firearm in commission of a crime of violence. Additional relevant facts arising out of the trial are discussed at greater length later in this opinion. This consolidated appeal followed.

## DISCUSSION

### I. Denial of Duncan's Motion for Severance & Motions for a Mistrial

#### A. Standard of Review

We "will only disturb a trial court's decision to deny a motion for a mistrial if the court has abused its discretion, and it is clear that the accused has been prejudiced."

9

*Conyers v. State*, 345 Md. 525, 561 (1997). *Accord Parker v. State,* 189 Md. App. 474, 493–96 (2009). As we explain in the following section, there are some circumstances in which the trial court's discretion is limited by constitutional considerations.

**B.     The *Bruton* Violation**

Duncan contends that, in light of the Supreme Court's holding in *Bruton v. United States*, 391 U.S. 123 (1968), the circuit court erred in denying both his motion for severance of his trial from Butler's and his multiple motions for mistrial that followed. The Court of Appeals has succinctly summarized the holding of *Bruton* as follows:

> *Bruton* rights are triggered when testimonial hearsay is introduced into evidence. In *Bruton*, the Supreme Court addressed "whether the conviction of a defendant at a joint trial should be set aside although the jury was instructed that a codefendant's confession inculpating the defendant had to be disregarded in determining his guilt or innocence." *Bruton*, 391 U.S. at 124–25, 88 S.Ct. at 1622, 20 L.Ed.2d at 478. During Bruton's joint trial with Evans, Evans's out of court confession inculpating both defendants had been admitted into evidence. The trial judge had given a limiting instruction to the jury to consider the confession only against Evans, but not against Bruton. The United States Court of Appeals for the Eighth Circuit affirmed. *Bruton v. United States*, 375 F.2d 355 (8th Cir.1967).
>
> The Supreme Court reversed. The Court held that the trial court's limiting instruction did not sufficiently protect Bruton's Sixth Amendment rights, because Evans had not testified, the introduction of Evans's confession added substantial weight to the Government's case against Bruton, and Bruton could not cross-examine Evans. *Bruton*, 391 U.S. at 137, 88 S.Ct. at 1628, 20 L.Ed.2d at 485. **The Court opined that a limiting instruction was insufficient to protect Bruton's right to cross-examine** and that there was no basis upon which to admit Evans's confession against Bruton. **When "the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial", the Court concluded, "limiting instructions [were not acceptable] as an adequate substitute for [Bruton's] constitutional right of cross examination."** *Id*. at 135–36, 137, 88 S.Ct. at 1628, 20 L.Ed.2d at 483, 484. ***Bruton*, then**, is premised upon the Confrontation Clause of the Sixth Amendment and **limits joinder,**

10

**as well as the efficacy of cautionary instructions when evidence of a testimonial nature is introduced.**

*State v. Payne*, 440 Md. 680, 717 (2014) (emphasis added) (alterations in original).[2]

Prior to trial in this case, the State conceded at the April 7 pre-trial hearing that Butler's statements made during his proffer sessions and phone calls with Duncan "do constitute testimonial statements and therefore trigger the confrontation clause which therefore implicates *Bruton*." At that hearing, the State also acknowledged that a mere redaction of Duncan's name from any of Butler's communications would not be sufficient to satisfy *Bruton*, but the State assured the circuit court that a *Bruton* violation could be avoided and that any *Bruton* issue "could be remedied" because the State would take greater precautions than those that had been held insufficient in "[*Gray v. Maryland*, 523 U.S. 185, 197 (1998)] . . . which was a simple deletion."[3]

The following colloquy then took place regarding the State's assurances that it would avoid the potential *Bruton* violation without the need for severing Butler's case from Duncan's:

> THE COURT: **So these proffers by Mr. Butler don't say that he was soliciting and enlisting Mr. Johnson to do Duncan's bidding?**

[2] The Sixth Amendment to the United States Constitution – incorporated to apply to the states via the Fourteenth Amendment, *Pointer v. State of Texas*, 380 U.S. 400, 406 (1965) – provides, in pertinent part:

> In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .

[3] In *Gray v. Maryland*, the Supreme Court held that a *Bruton* violation occurred where the prosecution inserted blanks or "delete" in place of the defendant's name in the incriminating confession of a codefendant. 523 U.S. 185, 197 (1998).

[THE STATE]: **They do implicate Mr. Duncan**, but the jail calls --

THE COURT: Well, okay so the --

[THE STATE]: -- so **there's no doubt about that.** But respectfully, the State submits that first of all what we would be referring to is conversations that are on the jail calls themselves.

But secondly, Your Honor, I think this is why we were alluding to the redaction solution, if the court has concerns, and what I was gonna add is if the court has concerns as trial is unfolding as to the substance of those passing references **the State would be prepared to agree that what Mr. Butler told detectives about Mr. Duncan's role in that would not be presented to the jury through the detectives.**

So in other words the State would present the jail calls to establish Mr. Duncan and Mr. Butler talking together about what they would do. The State would then present the detectives to present what Mr. Butler told them about getting Mr. Johnson and then Mr. Johnson reporting back to them. So that's the only part that . . . implicates the testimonial comments by Mr. Butler, and then the State would return to the jail calls with respect to Mr. Butler reporting back to Mr. Duncan what had happened. **So the**, the silo of **information that would come from the testimonial statements**, which is the only category of statements that would implicate *Bruton*, **would be redacted** if the, if the court wished and if defense counsel wished **to not implicate Duncan**.

\* \* \*

THE COURT: The State's prepared to, so with respect to the detective's testimony that's how you're presenting this information?

[THE STATE]: That's right Your Honor.

THE COURT: So you're prepared to direct the detectives that in answering questions about what Mr. Butler said to them, they are not to include references to what Mr. Butler said about Mr. Duncan.

[THE STATE]: Exactly your honor.

\* \* \*

12

THE COURT: **All right. You're gonna direct the detectives when they testify what Butler said to them at these proffer sessions, said to them about Johnson. They are not to mention Duncan.**

(Emphasis added.)

With that assurance from the prosecution, the court concluded that Duncan could be tried jointly with Butler. *Cf. State v. Hines*, 450 Md. 352, 369–70 (2016) (recognizing that, in some instances, it may be possible for a trial judge to eliminate any unfair prejudice attributable to non-mutually admissible evidence by "redacting evidence to remove any reference to the defendant against whom it is inadmissible").

At trial, however, the State introduced statements made by Butler that incriminated Duncan. During the direct examination of Detective Wolf, for example, the State played recordings of jail calls between Duncan and Butler, in which the voices of both defendants could be heard. Detective Wolf testified that, in his opinion, Duncan, whom the State identified by name, was one of the individuals participating in the calls played by the State. Over objections from appellants, the jury was also provided with transcripts of the calls between Duncan and Butler which identified Duncan by name in the left hand column of the transcript as one of the speakers.

The State then asked Detective Wolf to explain the meaning of various portions of conversations between Duncan and Butler – in essence, translate the coded words used by Duncan and Butler – and Detective Wolf provided those translations *based upon the explanations* of the meaning of certain words and phrases *Butler had provided to Detective Wolf during his proffer sessions*. In this manner, the State utilized incriminating statements codefendant Butler had made during the proffer sessions to support its case against Duncan.

13

Those statements Butler made during the proffer sessions were clearly testimonial hearsay which would have been otherwise inadmissible against Duncan.[4]

After Duncan had made numerous objections to the State's examination regarding Detective Wolf's translation of Duncan's jail calls with Butler, the circuit court *sua sponte* called a bench conference during which the following exchange occurred:

> THE COURT: I'm thinking further about [counsel for Duncan's] objection and it seems that it's appropriate at this time[, a]lthough [counsel for Duncan] didn't request it, to tell the jury that this information is not to be considered against Mr. Duncan.
>
> [THE STATE]: I know that that happens in jury instructions and we anticipated that, --
>
> THE COURT: But it seem --
>
> [THE STATE]: -- don't know that we have an objection to it here.
>
> THE COURT: All right.
>
> [COUNSEL FOR DUNCAN]: I, while we're up here I have a motion to make. I'm gonna make a motion for a mistrial on behalf of Mr. Duncan. When we had our motions hearing I asked for a severance when I learned that the State intended to use the statements by Mr. Butler. The State assured all of us that it would redact the statements by Mr. Butler so that it would not implicate Mr. Duncan and thereby not offend *Bruton*.

---

[4] One example of Butler's translations of conversations he had with Duncan that was introduced at trial via Detective Wolf explained what Duncan and Butler meant when they used the words "air holes." At trial, a recording of a jail phone call between Duncan and Butler was played for the jury, in which Butler could be heard asking "where was the air, air, air holes at for real?" In response, Duncan told Butler that "it's still in the house." On direct examination, the prosecutor asked Detective Wolf: "And did you speak to Mr. Butler about the term air holes? . . . What did he say air holes meant?" Detective Wolf responded, over objection from appellants' counsel, that he had spoken to Butler regarding the meaning of the term air holes, and that Butler had explained that air holes "referred to a, a gun."

14

When the State asked this detective to explicate what Butler meant he's talking to Duncan. Butler says, according to the detective, that what I meant here is we're going to get, we're going to get the victim, we're going to kill the victim, everything's in place in the victim. It's, and [Duncan is] talking to him. It's . . . hopeless that the State has elected to go further than what they indicated at the motions hearing. They've gone further in the sense that they're asking the detective now to explicate what Butler meant. That would be fine if my client weren't there but he's sitting right there and he's on the phone with him. It's hopeless.

THE COURT: Well I'll consider that further. It's not without merit.

[THE STATE]: Your Honor, if I may? At the beginning of this trial if [counsel for Duncan] had said I'm gonna concede that this is Mr. Duncan's voice, and this is his SID number, and this is him talking . . . . [B]ut the State has had to laboriously address his comments in pretrial, as well as in opening, and establish that this is Mr. Duncan. If the State is, has to prove that we have to prove that. With the thanks [sic] of an admonition that this is not be used against him, with the jury instruction that indicates that separate consideration [of] the [defendants] is appropriate I respectfully --

THE COURT: **I think it's almost impossible for the jury to disregard all of these conversations being with Mr. Duncan. How, how does this information [come] in against Mr. Duncan?**

[THE STATE]: Your Honor, it, it, **we're not trying to bring it in against Mr. Duncan**. The catch is that we have had to prove that this is Mr. Duncan. [Counsel for Duncan] is two-thirds of the way through this trial now indicating that it's obvious to the jury. That, it is not obvious to the jury until we prove it. And we have now, perhaps in [Duncan's counsel's] view, proven that and so he's prepared to concede it. But that is not the beginning of --

THE COURT: Well no, the testimony from this detective is that this is Mr. Duncan's voice which we've been listening to.

(Emphasis added.)

The circuit court then elected to defer ruling on Duncan's motion for a mistrial.

After additional testimony, the circuit court initiated another bench conference regarding

Duncan's objections and motion for a mistrial:

THE COURT: [Mr. Prosecutor], I've been considering further Detective Wolf's testimony about the words [that] Mr. Butler told Detective Wolf and the others at the meeting the words meant. And that seems testimonial. And that should not be coming in against Mr. Duncan. And so I am going to tell the jury to disregard that testimony of Detective Wolf.

[THE STATE]: Very well Your Honor.

THE COURT: I'm gonna strike it from this record.

The circuit court then instructed the jury to disregard Detective Wolf's testimony regarding the meaning of the coded language used in the jail calls between Duncan and Butler:

Members of the jury I have considered further over our luncheon recess some arguments that had been made to the court, and pursuant to my consideration of those issues **I believe it appropriate at this time to tell you that you are to disregard, and I am going to strike from the record testimony by Detective Wolf about what words meant according to Mr. Butler in the meeting that Mr. Butler had with Detective Wolf, Mr. Butler's attorney and some other individuals** that they have des [sic], that Detective Wolf has described. **So disregard what Detective Wolf said Mr. Butler said that words mean in the jail calls that we've heard.**

(Emphasis added.)

Later, during closing arguments, the State used a visual aid asserting that Butler had explained to Detective Anderson the entire conspiracy to murder Givens. Counsel for Duncan objected, and again moved for a mistrial as to Duncan. The circuit court denied the motion, but provided a second limiting instruction to the jury which arguably contradicted the court's prior instruction for the jury to disregard what the detective had "said Mr. Butler said that words mean in the jail calls." This time, the circuit court instructed the jury:

16

The statement made by Clifford Butler about which you've heard testimony that alleged, those alleged statements by Mr. Butler to Detective Anderson and Detective Wolf must only be considered by you against Mr. Butler in consideration of the charges against Mr. Butler. So the alleged statements by Mr. Butler to the detectives should not be part of your consideration of the charges against Mr. Duncan.

Despite the second instruction, the State now contends that no *Bruton* violation occurred because the testimony of Detective Wolf regarding his conversations with Butler that implicated Duncan was "stricken" from the record by the circuit court and the jury was instructed to disregard those conversations. In support of this contention, the State argues that this case was "not one of those extraordinary circumstances where the jury cannot be trusted to follow instructions." The State asserts in its brief: "With regard to the trial court's instruction to disregard entirely a portion of Detective Wolf's testimony, this type of instruction is commonplace and there is no reason to doubt the jury's ability to follow it."

But the Supreme Court said in *Bruton* that limiting instructions will generally be inadequate to cure the prejudicial impact of "powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, [when those statements] are deliberately spread before the jury in a joint trial." *Bruton*, *supra*, 391 U.S. at 135–36. The *Bruton* Court further observed that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id*. at 135.

As the Supreme Court stated in *Bruton*, "in the context of a joint trial **we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional**

17

**right of cross-examination**" where incriminating statements made by one codefendant are presented to the jury in a joint trial in which the codefendant does not testify and there is no opportunity for cross examination. *Id.* at 137 (emphasis added). *Cf. Crawford v. Washington*, 541 U.S. 36, 59 (2004) ("Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.").

The State's contention that "[t]he general rule that juries are expected to comply with a court's instructions applies here" is in direct conflict with what the Supreme Court said in *Bruton*. This Court has also previously rejected this very argument, stating:

> In *Bruton*, the "basic premise of *Delli Paoli*[ *v. United States*, 352 U.S. 232, 242 (1957),] that a properly instructed jury would ignore the confessor's inculpation of the nonconfessor in determining the latter's guilt," 391 U.S. at 129, was given a full burial and **replaced by a completely opposite premise or assumption, *i.e.*, that in spite of limiting instructions, a jury could not and would not disregard the inadmissible hearsay evidence contained in a confessor's inculpation of the nonconfessor in determining the latter's guilt.** Admission of such an extrajudicial statement at a joint trial, where the declarant confessor does not take the witness stand, would thus violate the defendant's right of cross-examination secured by the Confrontation Clause of the Sixth and Fourteenth Amendments to the United States Constitution.

*Earhart v. State*, 48 Md. App. 695, 698 (1981) (emphasis added). Accordingly, we reject the State's contention that the *Bruton* problem in this case was cured by the circuit court's limiting instructions to the jury.

The State contends in the alternative that "Detective Wolf's and Andersons's testimony about Butler's statements did not mention Duncan even in the abstract," and therefore, did not implicate Duncan, which is necessary for a *Bruton* violation to occur,

18

citing: *Gray v. Maryland*, 523 U.S. 185, 195–96 (1998); *Richardson v. Marsh*, 481 U.S. 200, 208 (1987) (for a *Bruton* violation to occur, a statement by a codefendant must be "incriminating on its face" or expressly implicate a codefendant); *United States v. Coleman*, 349 F.3d 1077, 1085 (8th Cir. 2003) (stating that "*Bruton* is not violated if the non-testifying defendant's statement only inculpates a codefendant inferentially–through linkage to other evidence." (citing *Richardson*, *supra*, 481 U.S. at 208)); *Brooks v. State*, 32 Md. App. 116, 119 (1976) ("In a joint trial, *Bruton* proscribes the admission of a non-testifying co-defendant's confession which implicates another co-defendant.").

We again disagree with the State. The testimony of Detective Wolf regarding Butler's explanatory statements to him clearly implicated Duncan and thereby triggered *Bruton*. Although the State contends that "substantial evidence was necessary in this case to link Butler's statements to Duncan," the record reflects otherwise. During direct examination of Detective Wolf, before playing recordings of jail calls during which Duncan could be heard, the State asked: "Are you able to compare the voice that you heard on the excerpts, as well as the full calls corresponding to these 19 records and determine whether or not in your opinion these are Mr. Duncan's voice on the calls at points or not?" After objection from appellants' counsel, Detective Wolf stated "Yes sir," and indicated that one of the voices on these calls was Duncan's. The jury was also provided transcripts of the calls with Duncan's name next to portions of the transcript indicating when he was speaking. Detective Wolf went on to testify regarding specific calls between Butler and Duncan, and what Butler told him regarding the meaning of the statements made during those calls.

19

As the Supreme Court said in *Gray*, *supra*, 523 U.S. at 196, where "[t]he inferences at issue [] involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately," *Bruton* is triggered. Detective Wolf's testimony rehashing his conversations with Butler "obviously refer[red] directly to someone," namely, Duncan. The jury did not need additional "substantial evidence," as the State contends, in order for Butler's statements to incriminate Duncan. Rather, the jury was told by the State that Duncan was one of the parties speaking in these phone calls, and that, based on Butler's incriminating statements to Detectives Wolf and Anderson, the subject matter of many of these calls was a plan to murder Givens and efforts to avoid prosecution after Givens had been murdered. Butler's statements implicated Duncan, who was not able to cross-examine Butler. Therefore, the statements fall under *Bruton*. *See also Hines*, *supra*, 450 Md. at 385 (stating: "Because the evidence implicated [the defendant] in a manner so obvious that there is a risk that the jury would not have followed the limiting instruction and not have considered [the codefendant's incriminating] statement against [the defendant], the trial court erred in denying a trial severance." (footnote omitted)).

The State also argues that any *Bruton* violation constituted harmless error. *See Dorsey v. State*, 276 Md. 638, 658–60 (1976) (applying the harmless error analysis in the context of *Bruton*). The Court of Appeals has summarized the harmless error standard as follows:

> ["]In *Dorsey v. State*, . . . we adopted the test for harmless error announced by the Supreme Court in *Chapman v. State*[, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)] . . . . As adopted in *Dorsey*, the harmless error rule is:

20

[']When an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of – whether erroneously admitted or excluded – may have contributed to the rendition of the guilty verdict.[']

["]In performing a harmless error analysis, we are not to find facts or weigh evidence. Instead, what evidence to believe, what weight to be given it, and what facts flow from that evidence are for the jury . . . to determine. Once it has been determined that error was committed, reversal is required unless the error did not influence the verdict; the error is harmless only if it did not play any role in the jury's verdict. The reviewing court must exclude that possibility beyond a reasonable doubt. To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record. The harmless error rule . . . has been and should be carefully circumscribed. Harmless error review is the standard of review most favorable to the defendant short of an automatic reversal.["]

*Taylor v. State*, 407 Md. 137, 164–65 (2009) (quoting *Bellamy v. State*, 403 Md. 308, 332–33 (2008)) (citations omitted) (some internal quotation marks omitted). In applying the harmless error standard, it is not appropriate to simply focus on the strength of other evidence in the State's case. *Dionas v. State,* 436 Md. 97, 116–17 (2013).

Upon reviewing the record in this case, we cannot say beyond a reasonable doubt that the testimony of Detective Wolf describing Butler's statements explaining the alleged conspiracy to murder Givens "in no way influenced the verdict" against Duncan, even though the trial court gave instructions to disregard that portion of Detective Wolf's testimony. *Taylor*, *supra*, 407 Md. at 165.

21

We hold that the circuit court abused its discretion in denying Duncan's motions for a mistrial once it became clear that Detective Wolf's testimony about Butler's incriminating statements also implicated Duncan.

## II. Butler's Proffered Statements

Prior to the beginning of trial, the circuit court held that Butler breached the proffer agreements he entered into with the State, finding: "I think the proffer agreement is clear. The fact that Mr. Butler initially says that Mr. Thomas is the shooter [during the first proffer session] and then says Mr. Johnson is the shooter [during the second proffer session;] when he said Mr. Thomas was the shooter, he breached the agreement that existed between the parties."

> Butler, however, contends in his brief that the December 1 proffer agreement
>
> was orally modified when, on December 5, 2011, he was told by Detective Anderson, ***without objection by . . . the prosecutor in Mr. Butler's case who was also present***, that the parties were going to "start over", that Mr. Butler was being given "an opportunity to start from the beginning", and that "***if he continued to lie*** . . . the proffer will be used against him."

(Emphasis in original, citations to the record omitted.)

Under these circumstances, Butler argues, the December 5 proffer agreement "abrogated the previous one." Butler asserts that the circuit court should have found that the second proffer session gave him a "fresh start," and any false statements he had made during the first proffer session would be of no consequence so long as he was truthful during the second session that he had requested. As a result, Butler argues, the circuit court erred by allowing the State to declare the proffer agreements materially, and incurably, breached because of false statements the circuit court determined he made during the first

22

proffer session, and the court erred in ruling that the State could offer into evidence any statements Butler had made during the proffer sessions. We agree with Butler.

### A. Standard of Review

"As a general proposition, pre-trial agreements such as cooperation and proffer agreements are interpreted according to principles of contract law." *United States v. $87,118.00 in U.S. Currency*, 95 F.3d 511, 516 (7th Cir. 1996). Given the lack of case law in Maryland concerning proffer agreements, and the similarities between proffer agreements and plea agreements, we view cases addressing construction and breaches of plea agreements as instructive. "'[C]ontract principles should generally guide the determination of the proper remedy of a broken plea agreement.'" *Cuffley v. State*, 416 Md. 568, 579 (2010) (quoting *Solorzano v. State*, 397 Md. 661, 668 (2007) (second internal quotation omitted)).

"Contract principles, however, 'are not enough to resolve disputes over the proper interpretation of a plea bargain.'" *Id*. at 580 (quoting *Solorzano, supra*, 397 Md. at 668). "Rather, '[d]ue process concerns for fairness and the adequacy of procedural safeguards guide any interpretation of a court approved plea agreement.'" *Id*. (quoting *Solorzano, supra*, 397 Md. at 668). "'[T]he standard to be applied to plea negotiations is one of fair play and equity under the facts and circumstances of the case, which, although entailing certain contract concepts, is to be distinguished from . . . the strict application of the common law principles of contracts.'" *Tweedy v. State*, 380 Md. 475, 488 (2004) (quoting *Jackson v. State*, 358 Md. 259, 278 (2000)).

The United States Court of Appeals for the Seventh Circuit has expressly ruled that similar concerns of fairness and due process apply when interpreting proffer agreements. *United States v. Farmer*, 543 F.3d 363, 374 (7th Cir. 2008) ("[P]roffer agreements that are a part of ongoing criminal proceedings are unique contracts and the ordinary contract principles are supplemented with a concern that the bargaining process not violate the defendant's rights to fundamental fairness under the Due Process Clause.") (internal quotation marks omitted)). *Cf. United States v. Pielago*, 135 F.3d 703, 709 (11th Cir. 1998) ("The construction of proffer agreements, like plea agreements, is governed generally by the principles of contract law, *as we have adapted it for the purposes of criminal law*." (emphasis added)). Cases from the United States Courts of Appeals for the Fourth Circuit and Second Circuit have limited construction of proffer agreements to the four corners of the document, *see*, *e.g.*, *United States v. Gillion*, 704 F.3d 284, 292 (4th Cir. 2012) ("[A] proffer agreement operates like a contract; accordingly, we examine its express terms to determine whether the defendant is in breach."); *United States v. Liranzo*, 944 F.2d 73, 77 (2d Cir. 1991) ("Where the language of a contract is unambiguous, the parties' intent is discerned from the four corners of the contract."). But, because the view expressed by the United States Courts of Appeals for the Seventh and Eleventh Circuits is more in line with the approach that the Maryland Court of Appeals has adopted with respect to plea agreements, we conclude that Maryland courts should apply the principles of interpretation those courts have applied to proffer agreements, *i.e.*, ordinary contract principles supplemented with due process concerns for fundamental fairness as in *Cuffley*, *Solorzano*, and *Tweedy*.

In *Ray v. State*, 230 Md. App. 157, 189 (2016), we stated that an "appellate court makes the *de novo* determination, as a question of law, as to what the terms of a plea agreement actually were." Our "prime directive for statutory construction, for contract construction, and now for the construction of a plea agreement is simply to read the words themselves that call for construction. If their meaning is clear and distinct and undisputed, the interpretive exercise is over. This is the core principle for construing the meaning of any contract." *Id.* at 182–83. We also note that any "ambiguity in [a] plea agreement is resolved against the government '[b]ecause of the Government's advantage in bargaining power.'" *Cuffley*, *supra*, 416 Md. at 583 (quoting *United States v. Gebbie*, 294 F.3d 540, 552 (3d Cir. 2002) (second alteration in original)). In *Ray*, *supra*, 230 Md. App. at 188–89, we endeavored to determine objectively "what a reasonable non-lawyer's version of the deal would have been under circumstances similar to those of the defendant . . . ." We shall apply similar principles to our interpretation of Butler's proffer agreements, and our consideration of whether the circuit court properly held that the version of the proffer agreement dated December 5 did not, as Butler contends, supersede the agreement signed December 1.

## B. One or Two Proffer Agreements?

First, we review *de novo* whether the circuit court correctly viewed the December 5 proffer agreement as ineffective to provide Butler any protection against the prosecution's use of the statements he made during either of the proffer sessions. During a hearing conducted prior to jury selection, the circuit court addressed a motion by the State to avoid the proffer agreement's restrictions on the use of Butler's statements. The State argued

25

that Butler's proffered statements, in their entirety, should be admissible in evidence against him because he clearly gave false information during the December 1 session:

> [THE STATE]: Your honor, just to clarify the scope of the motions hearing it's my understanding that Mr. Butler does not claim, nor does defense counsel claim that there was a constitutional defect of this . . . . Mr. Butler's counsel, was present for the proceeding. He was not subpoenaed. He was not there against his will. He had . . . initiated the proceeding. The question is whether or not there was a breach of contract with respect to the proffer agreement. **As the proffer agreement sets forth, the statements cannot be used against Defendant unless an, an express material condition he withholds material information knowingly, or if he is not fully truthful and candid.** And the contract is explicit that if he is not truthful during the proffer then the State is permitted to use the statements that Mr. Butler makes with counsel present against him for any purpose in any proceeding is the express language of the contract. As a consequence the State intends to present testimony and evidence this morning that what Mr. Butler said during those proffer sessions was untruthful. Some of it was certainly truthful, but there are material misrepresentations and material omissions in the course of those.

(Emphasis added.)

The State then called as its witness Detective Anderson, who participated in both proffer sessions with Butler. After Detective Anderson testified that Butler had made what he believed were false statements during the December 1 session, the following exchange took place concerning the second proffer session held on December 5:

> Q [THE STATE]: So let's turn to the second proffer. You've already seen the Exhibit that was marked. This was reaffirmed at the beginning of the second proffer. Is that a fair characterization of what happened at the beginning of the second proffer?
>
> A [DETECTIVE ANDERSON]: Yes.
>
> Q: And again this was initiated by defense counsel?
>
> A: Yes.

Q: There was no grand jury subpoena for Mr. Butler at this point?

A: No sir.

* * *

Q: And on that second date on the right column of the proffer session there are initials next to my name, [and defense counsel's] name, and Mr. Butler with the date 12/5/2011. Were you present when those initials were affixed to the, to the, to the dates?

A: I was.

* * *

**Q: And was it made clear to Mr. Duncan that, excuse me, Mr. Butler, excuse me, was it made clear to Mr. Butler during that session that any lies that he had said during the first session would be forgiven and that it was a blank slate?**

**A: No.**

**Q: Was it clear that if he'd already lied that the contract would in some sense already be breached?**

**A: Yes.**

(Emphasis added.)

But, on cross-examination, counsel for Butler elicited the following testimony from

Detective Anderson regarding the second proffer session:

**Q [COUNSEL FOR BUTLER]: Now [on December 5, 2011,] there was actually a new contract entered into; correct? And it's indicated by the new date and the initials of the party; is that correct? Is that correct?**

**A [DETECTIVE ANDERSON]: I don't think that's an accurate reflection. It's not a new contract, it was the same contract with the same language --**

**Q: Okay.**

27

**A: -- that they just initialed with a new, new date on it.**

**Q: The original contract is a separate contract from this; correct? It's not the same contract. The original contract doesn't have December 5th date on it; correct?**

**A: Correct.**

* * *

Q: Okay. And the proffer agreement is, is read to him correct?

A: Yes.

Q: And who actually reads the proffer agreement to him on that particular date?

A: Same person from the State.

**Q: Okay the State? And on that particular date you started fresh; right? Correct?**

**A: What do you mean by "fresh"?**

**Q: You started fresh. It, it, it's a new date as indicated by the initial, initials by the individuals and the date of 12/5/2011, it, you started from the beginning; correct?**

**A: We started from the beginning --**

**Q: And did you --**

**A: -- but not, not because it was a, a new agreement, <u>we started from the beginning because we didn't have this, the actual story. So we had to start from the beginning</u>. It was explained to him again that look, you have to be honest, you have to be truthful.**

Q: Um hum.

A: And **<u>so let's start over again</u>** because we don't believe you were.

Q: Okay.

28

A: **So we gave him an opportunity to start from the beginning** but it wasn't a new, I don't think that's a good way to categorize it.

* * *

Q: Okay. Did you tell Mr. Butler that if you gave us the, the true story that you were seeking that you were gonna use his statements against him?

A: Yes.

**Q: So you, you asked the man for the true story and you said if you give me the true story, Mr. Butler, we're gonna use this against you, and then he gave you a different story; is that your testimony?**

**A: Yeah, it was not, I don't think it was framed in that way but he was read the proffer agreement again and it was explained to him explicitly that if he continues to lie that the information he tells us will be used against, or could be used against him by the State.**

* * *

Q: -- so at that particular time you, you told Mr. Butler that if you tell us the truth now, or, or you told Mr. Butler if he continued to tell you the non-truth it would be used against him by the State; correct? Correct?

A: I don't think it was framed in those terms, no. I don't think that's an accurate statement.

**Q: Well detective, you just testified that you told Mr. Butler that you read him the elements of the proffer agreement.**

**A: Yes.**

**Q: And that you told Mr. Butler that if he continued to lie to you as you felt he did in the first proffer session it would be, the State would be able to use that against him; correct? You testified to that just now; correct?**

**A: Yeah, it was, it's in the agreement --**

**Q: Right.**

**A: -- and the agreement was read to him.**

29

**Q: So wouldn't you say, detective, at this point in time you started fresh? You believed that Mr. Butler had told you a lie, you asked him to tell you the truth in the second proffer; correct?**

**A: Yes.**

**Q: And you said if he didn't tell you the truth now the State could use it against him; correct? Correct?**

**A: Yes, it's in the agreement.**

(Emphasis added.)

After cross-examination and re-cross examination of Detective Anderson, the circuit court heard additional argument from Butler and the State. Following argument from both parties, the circuit court focused on a false statement Butler had made during the first session, and granted the State's motion to avoid the use restrictions of both proffer agreements, stating:

> THE COURT: All right. **So is your argument, is,** I don't know that I follow all these breaches you've listed. **That the fact that in the first proffer he says Darren Thomas is the shooter, and second proffer he says Mr. Johnson is the shooter, that's sufficient all by itself.**
>
> [THE STATE]: **Yes.**
>
> THE COURT: **Even if I don't follow any of these other misrepresentations that you're telling me about?**
>
> [THE STATE]: **Absolutely Your Honor.** That, that is, **that is exactly the State's position.** I was trying to reinforce the record on this matter with a number of additional ones, but this could have been perhaps a simpler proceeding by just pointing to that.
>
> THE COURT: All right.
>
> [THE STATE]: Thank you Your Honor.

> THE COURT: **All right.** I think the proffer agreement is clear. The fact that Mr. Butler initially says that Mr. Thomas is the shooter and then says Mr. Johnson is the shooter, **when he said Mr. Thomas was the shooter [during the December 1 session] he breached the agreement that existed between the parties.**

(Emphasis added.)

Although the Maryland appellate courts have not addressed interpretations of proffer agreements, we recently addressed the application of contract principles to interpretations of plea bargains, and we described the appropriate perspective for a court's interpretation as that of a reasonable non-lawyer in the position of the defendant:

> Rather than accept the defendant's subjective version of what his understanding actually was, however, we prefer to determine objectively what a reasonable non-lawyer's version of the deal would have been under circumstances similar to those of the defendant, confining the knowledge of that hypothetical reasonable man to that which was formally on the record of the hearing on the acceptance of the plea.

*Ray*, *supra*, 230 Md. App. at 188–89 (emphasis omitted).

We will apply a similar approach to our interpretation of proffer agreements. But, we recognize that, unlike the formal record available when plea agreements are accepted, there may not be any "record of the hearing on the acceptance" of the proffer agreement. Here, the evidence before the circuit court regarding the proffer agreements consisted of the two signed agreements and Detective Anderson's testimony. Courts outside of Maryland have held that, in construing proffer agreements, "[t]he written agreement should be viewed against the background of the negotiations" leading up to the agreement, and "[a]ny ambiguities in the terms of a proffer agreement should be resolved in favor of the

criminal defendant." *Pielago*, *supra*, 135 F.3d at 709–10 (internal quotation marks omitted).

We have previously stated that "[t]he best evidence of what the contract (the plea agreement) is or what the contract says is indisputably the original contractual document itself." *Carlini v. State*, 215 Md. App. 415, 446 (2013), *rev'd on other grounds*, 444 Md. 278, 292 (2015). But evidence of what the defendant reasonably understood may also be considered. *Ray, supra,* 230 Md. App. at 188–90.  The Court of Appeals stated in *Baines v. State*, 416 Md. 604, 615 (2010): "[I]f examination of the terms of the plea agreement itself, by reference to what was presented on the record at the plea proceeding before the defendant pleads guilty, reveals what the defendant reasonably understood to be the terms of the agreement, then that determination governs the agreement." As the United States Court of Appeals for the Eleventh Circuit noted in *Pielago*, *supra*, 135 F.3d at 709, the negotiations leading up to a proffer agreement play a role in the interpretation of a proffer agreement similar to the manner the record at the plea proceeding plays a role in the interpretation of plea agreements.

Bearing in mind that "[d]ue process concerns for fairness and the adequacy of procedural safeguards guide any interpretation" of a proffer agreement, *Solorzano*, *supra*, 397 Md. at 668 (addressing plea agreements), and that any ambiguity is resolved against the government, *Cuffley*, *supra*, 416 Md. at 583 (addressing plea agreements), we turn to the proffer agreements in this case and consider what a reasonable person in Butler's position would have thought the agreement meant on December 5, 2011, when he

32

voluntarily met with the police and prosecutor, and agreed to provide additional incriminating statements. *See Ray*, *supra*, 230 Md. App. at 188–89.

The proffer agreements signed at each of the proffer sessions contain identical terms. The sole difference between the two versions of the agreements is the addition of dates and initials to the document dated "12/5/11." On December 5, each party initialed to the right of the signature lines where they had signed on December 1, and added the date "12/5/11" next to their initials. In all other respects the agreements are identical.

The language of the proffer agreement outlining Butler's obligation of candor, and the consequences for failing to abide by the agreement, states:

> 1. Except as otherwise provided in paragraphs two and three, no statements made or other information provided by you or your attorney during the proffer will be used against you in any criminal case.

> * * *

> 3. Your complete truthfulness and candor are express material conditions to the undertaking of the State set forth in this letter. Therefore, the State may use statements made or other information provided by you or your attorney during the proffer under the following circumstances. . . .

> * * *

> b. If the State should ever conclude that you have knowingly withheld material information from the State or otherwise have not been completely truthful and candid with the State, the State may use any statements made or other information provided by you or your attorney during the proffer against you for any purpose. If the State does ever so conclude, it will notify you prior to making any such use of any such statements or other information.

As noted above, Butler's proffer agreements "should be viewed against the background of the negotiations" leading up to the agreement, *Pielago*, *supra*, 135 F.3d at

709, similar to the manner in which plea agreements are viewed in light of statements made during the hearing at the time a plea is accepted. *Ray*, *supra*, 230 Md. App. at 188–89. During the circuit court's hearing on the State's motion to avoid the proffer agreement's restrictions on the use of Butler's proffer statements, Detective Anderson testified at different points during his testimony that Butler was told at the outset of the December 5 session that, if he "continues" to lie, the State would be able to use his statements against him. The transcript reflects that, on December 5, Butler "was read the proffer agreement again and **it was explained to him explicitly that if he continues to lie that the information he tells us will be used against, or could be used against him** by the State." (Emphasis added.)

We are persuaded that, when Butler was cautioned that, if he "*continues* to lie," his statements could be used against him, that would be understood by a reasonable defendant who appeared voluntarily for a second proffer session (and who was deciding whether to make additional incriminating statements) as an offer of a fresh start on December 5. From the perspective of a reasonable defendant, there would be nothing to gain by providing additional, and more accurate, incriminating evidence if the State had irreversibly determined he was already in breach of the agreements and everything he said – both before and during the second session – could be used in a criminal prosecution against him. The more reasonable interpretation that a defendant in Butler's position would have inferred from the cautionary warning and the execution of the renewed *non-use agreement* was that, if he did not continue to lie, but now provided truthful information, he could enjoy the

34

benefit of Paragraph 1 of the proffer agreements, and "no statements made" by him would be used against him in any criminal case.

Although Detective Anderson testified that Butler was told that, "if he'd already lied that the contract would in some sense already be breached," this would not communicate to a reasonable defendant in Butler's position that he could never cure that breach, and, no matter how truthful he was during the second proffer session, his statements could all still be used against him due to false statements he had made during the first proffer session. In our view, a reasonable person in Butler's circumstances would have understood the effect of re-signing the proffer agreement on December 5 as providing him an opportunity to speak truthfully during the second session, and thereby cure any breach he had previously committed by virtue of any prior lies he had told.

The Court of Appeals has stated on multiple occasions that "ambiguity in [a] plea agreement is resolved against the government '[b]ecause of the Government's advantage in bargaining power.'" *Cuffley*, *supra*, 416 Md. at 583 (quoting *United States v. Gebbie*, 294 F.3d 540, 552 (3d Cir. 2002) (second alteration in original)); *Solorzano*, *supra*, 397 Md. at 673 (stating that it "is axiomatic that due process requires courts to construe any ambiguity in a plea agreement against the government") (internal quotation omitted)). *Accord Pielago*, *supra*, 135 F.3d at 709–10 ("Any ambiguities in the terms of a proffer agreement should be resolved in favor of the criminal defendant."). Moreover, "[d]ue process concerns for fairness and the adequacy of procedural safeguards" support Butler's interpretation of the proffer agreement. *See Solorzano*, *supra*, 397 Md. at 668.

35

Detective Anderson testified that, at the conclusion of the first proffer session, he "didn't necessarily believe what Mr. Butler was saying," and, once he completed further investigation of Darren Thomas's involvement, Detective Anderson definitely believed that Butler had falsely named Darren Thomas as the shooter. If the State's interpretation of the proffer agreement were correct, Detective Anderson and the State would have known at the start of the meeting on December 5 that the proffer agreement had been breached, and that Butler's statements could be used against him, regardless of Butler's performance at that session. To permit the State's encouragement of Butler to speak truthfully and provided additional incriminating statements under the guise of a "fresh start," while the State actually viewed the proffer agreement as already having been incurably breached and providing no assurance against use of the statements, is an affront to the notions of fair play and equity we employ when scrutinizing proffer and plea agreements.

As quoted above, the circuit court accepted the prosecutor's argument that one specific false statement made during the first proffer session – namely, that Darren Thomas was the shooter – was sufficient to fully relieve the State of its agreement not to use in the criminal prosecution of Butler any statements he made during the proffer sessions. For the reasons we have explained above, we conclude that the circuit court erred in accepting the State's argument and in failing to interpret the December 5 proffer agreement as a modification of the proffer agreement, providing Butler an opportunity for a fresh start.

But the State argues on appeal that, even if the circuit court had focused on the December 5 session, it could have found that Butler committed material breaches of his

36

obligations to be completely truthful and not withhold information. In its brief, the State

asserts:

> Even at the conclusion of the second proffer session Butler failed to be "completely truthful and candid" with the State. He neglected to tell police about a phone call with Duncan's sister four hours before the murder; in fact, Butler claimed that he had only ever spoken with Duncan's sister on three-way calls with Duncan. He also claimed that he never wrote Duncan any letters while Duncan was in jail . . . that he had not spoken with Keyon [presumably Keon] Beads after the murder. Phone records and the recorded jail calls established that both of those statements were false.
>
> Butler also failed to tell the State that the person referred to as "shorty" in the last recorded phone call was Johnson, and that when Butler said "shorty" was "deep somewhere," "off the radar," he meant that Johnson was hiding in Baltimore City to avoid detection. During argument on the motion, the State reiterated that Butler told police on December 1st that he did not know who "shorty" was, and failed to correct that misrepresentation on December 5th.

But the State conceded at oral argument that Butler was not asked the identity of

"shorty" during the December 5 session, and no letters between Butler and Duncan were

ever introduced at trial. Butler points out that none of the other alleged misstatements made

on December 5 were material or detrimental to the State's prosecution of the case. Indeed,

the trial court made no finding of any material misstatement during the December 5 proffer

session. The State does not deny that it benefitted from the additional information provided

by Butler during the December 5 session. During closing arguments at trial, the State told

the jury that Butler had "confirmed the entire conspiracy for us. Everything we thought

was true he told us was true." Detective Anderson made a similar acknowledgment during

the pretrial hearing addressing the State's motion to use Butler's proffer statements against

him:

37

Q [COUNSEL FOR BUTLER]: Okay. Now sir, during the second proffer did Mr. Butler talk about Mr. Beads['] involvement?

A [DETECTIVE ANDERSON]: Yes.

Q: Did Mr. Butler talk about Mr. Duncan's involvement?

A: Yes.

Q: Did Mr. Butler talk about Mr. David Johnson's involvement?

A: Yes.

Q: Did Mr. Butler talk about his own involvement?

A: Yes.

Q: And based on your investigation and . . . subsequent arrests[,] these four individuals were arrested for these charges; correct?

A: Yes.

Q: And at the time of the proffer on December 5, 2011, no one [had been] arrested; correct?

A: Correct.

Q: And this man [Butler] doing the proffer, when he agreed to tell you the truth, implicated, [he] implicated everyone that you . . . subsequently charged; is that correct?

A: Yes.

**Q: So overall [as to] Mr. Butler, would you say he told you the truth as far as you putting together your homicide case?**

**A: At the, at the end of the proffer, yes.**

**Q: Okay. So at the end of the proffer he told you this was correct.**

**A: Yes.**

(Emphasis added.)

38

We agree with Butler's contention that the State failed to present evidence sufficient to show the motion court that he committed a material breach of the December 5 proffer agreement. Consequently, the circuit court erred in granting the prosecution permission to introduce evidence of the statements Butler made during the proffer sessions.

The State contends in the alternative that any error on the part of the circuit court in denying the exclusionary effect of the proffer agreements and admitting Butler's statements against him was harmless error. The State argues that "[t]he majority of the testimony about Butler's statements to police was merely cumulative to the far more damning evidence in the recorded phone calls between Duncan and Butler" that were played for the jury. The State further contends that Detective Anderson's testimony as to what certain words or phrases in Butler and Duncan's calls meant, based upon Butler's explanation of the calls, was "ultimately inconsequential" because "it does not take much imagination to decipher" the meaning of the words and phrases used by Duncan and Butler. We disagree.

We cannot say, "beyond a reasonable doubt, that the error *in no way* influenced the verdict." *Dorsey*, *supra*, 276 Md. at 659 (emphasis added). Detective Anderson's testimony, based upon the proffer sessions with Butler, provided explanations for the jury of the words and phrases in multiple phone calls implicating both Butler and Duncan as participants in the murder of Givens. Although the State now contends that it does not take "much imagination to decipher" the meaning of the coded language used by Butler and Duncan in their phone calls, the prosecution elected not to take that risk at trial, and we cannot say beyond a reasonable doubt that the use of Butler's statements via Detective Anderson's testimony did not help persuade the jury to conclude that Butler and Duncan

39

plotted to kill Givens. *Id.* Therefore, we hold that the circuit court erred in granting the

State's motion to find Butler in violation of the proffer agreements, and remand for a new

trial as to Butler.

> **IN APPEAL NO. 1004 JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED, AND CASE REMANDED FOR NEW TRIAL. COSTS TO BE PAID BY BALTIMORE COUNTY.**
>
> **IN APPEAL NO. 1104 JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED, AND CASE REMANDED FOR NEW TRIAL. COSTS TO BE PAID BY BALTIMORE COUNTY.**